574 F.2d 131
 Fed. Sec. L. Rep. P 96,376
William SHLENSKY et al., Plaintiffs-Appellants,
v.
B. R. DORSEY, Charles M. Beeghley, Z. D. Bonner, E. D.
Brockett, R. Hal Dean, James H. Higgins, James E. Lee,
Beverley Matthews, Nathan W. Pearson, Edwin Singer, Edward
B. Walker, III, James H. Walton, Fred Deering, Claude C.
Wild, Jr., Royce H. Savage, William C. Viglia, William L.
Henry, Herbert C. Manning, Zane Q. Johnson, Price Waterhouse
& Company and Gulf Oil Corporation, Defendants.
Appeal of PROJECT ON CORPORATE RESPONSIBILITY, INC.,
Objecting Shareholder.
Appeal of Pat S. HOLLOWAY, Objecting Shareholder.
 Nos. 77-1156, 77-1157, 77-1158.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 1, 1977.
Decided March 6, 1978.
Rehearing Denied April 17, 1978.
As Amended May 19, 1978.
 
 Nancy Gertner, Silverglate, Shapiro & Gertner, Boston, Mass., Howard A. Specter, Litman, Litman, Harris & Specter, Pittsburgh, Pa., for plaintiffs.
 James D. Morton, Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa., for Price Waterhouse & Co.
 Joseph D. Gebhardt, Washington, D. C., for Project on Corporate Responsibility, Inc., Objecting Shareholder.
 Pat S. Holloway, pro se.
 Edwin L. Klett, Eckert, Seamans, Cherin & Mellott, Pittsburgh, Pa., for Gulf Oil Corp., et al.
 Before GARTH and MARIS, Circuit Judges, and MEANOR, District Judge.
 OPINION OF THE COURT
 MARIS, Circuit Judge.
 
 
 1
 We are here presented with three appeals from orders of the District Court for the Western District of Pennsylvania terminating a consolidated derivative suit which had been brought by shareholders of Gulf Oil Corporation (herein "Gulf"). At our No. 77-1156 the plaintiffs appeal from the district court's order entered November 18, 1976, dismissing Price Waterhouse & Company (herein "Price Waterhouse") as a party defendant in the action. At our No. 77-1157 the Project on Corporate Responsibility, Inc. (herein "the Project"), an objecting shareholder, appeals from the court's order also entered November 18, 1976, approving the compromise and settlement of the case to which all of the parties to the litigation with the exception of Price Waterhouse had agreed. Pat S. Holloway, also an objecting shareholder, appeals at our No. 77-1158 from the court's order entered November 19, 1976, awarding to the plaintiffs' accountants and attorneys payment of their fees and reimbursement of their expenses in the amount of $607,777.95. The Project joined in the district court in Holloway's attack on the award of fees and expenses and also appeals from that order at our No. 77-1157.
 
 I. HISTORY OF THE CASE
 
 2
 The eight actions comprising the consolidated derivative suit now before us were instituted between March and November of 1975 in five separate district courts,[1] including the District Court for the Western District of Pennsylvania to which the suits were eventually transferred and there consolidated. Named as defendants are Gulf, eighteen of its present and former officers and directors, an officer of a former Gulf subsidiary, and Price Waterhouse, Gulf's former independent certified public accountant and auditor. The shareholders seek recovery on behalf of Gulf of allegedly illegally expended corporate funds in excess of $18,800,000, incidental monetary damages and costs incurred by Gulf, equitable relief and the plaintiffs' litigation expenses.
 
 
 3
 The derivative suits arose out of public revelations in 1973 and 1975 by Gulf officials and the Securities and Exchange Commission of alleged illegal corporate action. Investigation by the Watergate Special Prosecution Force into the activities of the Finance Committee to Re-Elect the President (in 1972) precipitated Gulf's disclosure in 1973 that its vice president in charge of government relations, Claude C. Wild, Jr., had, in 1971 and 1972, donated out of corporate funds $100,000, $15,000 and $10,000 to the 1972 presidential election campaigns of President Nixon, Representative Mills and Senator Jackson, respectively. The contributions amounting to $125,000 were subsequently returned to Gulf. In November 1973 Gulf and Wild pleaded guilty to criminal charges of violations of the Federal Election Campaign Act, 18 U.S.C. § 610. Gulf was fined $5,000 and Wild, $1,000.
 
 
 4
 The Project and three other Gulf shareholders on March 27, 1974, filed a derivative action in the District Court for the District of Columbia, Project on Corporate Responsibility, Inc. et al. v. Gulf Oil Corp. et al., Civil Action No. 74-493, naming as defendants Gulf, Wild and seven other officers and directors of Gulf. The plaintiffs sought on behalf of Gulf reimbursement for the corporation's expenses incurred in connection with the unlawful corporate campaign contributions, the ensuing investigations, prosecutions and imposition of fines. The case was subsequently dismissed pursuant to the court's approval of a settlement agreement entered into on June 27, 1974, by the parties. On August 3, 1976, however, the suit was reinstated and is presently pending in the District Court for the District of Columbia.[2]
 
 
 5
 On March 11, 1975, the Securities and Exchange Commission filed a civil complaint in the District Court for the District of Columbia against Gulf and Wild for violations of the full disclosure and accurate reporting requirements of sections 13(a) and 14(a) of the Securities and Exchange Act of 1934, 15 U.S.C.A. §§ 78m(a) and 78n(a), and of various of the Commission's rules promulgated under the Act.
 
 
 6
 The Commission alleged a course of conduct by Gulf officials from 1960 to the date of the filing of the complaint whereby a secret fund of corporate monies was maintained and disbursed for unlawful political purposes. The corporate financial statements and other reports sent to shareholders and filed with the Commission for the period in question failed to disclose the existence of the fund. Over $10,000,000 of Gulf funds were allegedly channeled, by means of false entries in corporate books and records, through Bahamas Exploration Company, Ltd.,[3] a subsidiary of Gulf located in Nassau, The Bahamas, for eventual distribution to political individuals and entities in the United States and foreign countries. Some $5,400,000 was allegedly returned to the United States for such use and the balance distributed overseas.
 
 
 7
 Preliminary to the filing of its complaint, the Commission's staff had conducted extensive examination of corporate documents and had taken the testimony and affidavits of a number of Gulf's officers and directors. The Commission's prior contacts and negotiations with Gulf led to the entry with Gulf's consent, on the date of the filing of the complaint, of a final judgment granting a permanent injunction against Gulf accompanied by an undertaking by Gulf to establish a Review Committee consisting of a chairman not connected with Gulf and two independent Gulf board members. The committee was authorized to review investigations and to make its own inquiry into the use of Gulf's funds for political purposes. At the end of 120 days the committee was to submit a written report of its findings and recommendations to Gulf's board of directors for appropriate action by the members not involved in the activities set forth in the Commission's complaint. Copies of the report were to be filed with the Commission and in the district court. The committee's report, commonly known as the McCloy Report[4] was released on December 30, 1975, and was made available to the shareholders of Gulf.
 
 
 8
 On March 26, 1975, Shlensky v. Wild et al., the first-filed of the derivative actions consolidated in the case before us, was filed in the District Court for the Western District of Pennsylvania. The district court ordered a stay until October 1, 1975, of the proceedings in view of the pendency of the Review Committee investigation directed by the consent judgment entered in the suit instituted by the Securities and Exchange Commission in the District Court for the District of Columbia. The stay was subsequently extended to January 15, 1976, and was applied to the three related cases filed in the District Court for the Western District of Pennsylvania.
 
 
 9
 By January 16, 1976, the related actions filed in the various other district courts had been transferred to the District Court for the Western District of Pennsylvania which, on that date, ordered the consolidation of the actions and the filing of a consolidated amended complaint, designated lead counsel for purposes of initiating discovery and conducting settlement negotiations, and issued a preliminary pretrial schedule.
 
 
 10
 The consolidated amended complaint, filed February 17, 1976, asserted that the individual defendants, acting singly and in concert made, or caused to be made, unlawful contributions to federal election campaigns in violation of the Federal Election Campaign Act, 18 U.S.C. § 610. It set forth details of the disclosures contained in the Securities and Exchange Commission's complaint against Gulf and Wild in connection with Gulf's failure to disclose in annual reports and other corporate statements the maintenance within the corporation of a fund out of which unlawful disbursements were made for political purposes. In addition, it was asserted that B. R. Dorsey, chairman of Gulf's board of directors and its chief executive officer until January 1976, and other top level executives and directors, named as defendants in the action, were cognizant of the arrangements whereby corporate funds were expended for over a decade for illegal purposes. The complaint stated that Price Waterhouse knew or should have known of the bookkeeping irregularities which concealed the creation and use of the secret funds and that it aided in a cover-up of the unlawful diversion of Gulf's funds.
 
 
 11
 The plaintiffs asserted that illegal contributions of Gulf's funds amounting to $4,460,000 were made to the ruling parties in Korea and Bolivia between 1966 and 1970 and to an Arabic public relations group to help promote the Arab cause within the United States and that the failure of subsequently elected directors to communicate their knowledge of these contributions to shareholders invalidated the elections and required that they be set aside.
 
 
 12
 The plaintiffs further stated in the complaint that, in November 1974, Gulf's board of directors rescinded certain compensatory stock options with an option price of $21.75 per share previously issued to various officers and directors. The board replaced the surrendered options with stock options at the reduced price of $17.8125. It was alleged that this action violated the terms of a 1974 stock option plan approved by the shareholders and damaged the corporation in that the resulting enrichment of those officers and directors by approximately $4,000,000 served to reward or silence them with respect to the illegal diversion of corporate funds. It was further alleged that the exercise of stock appreciation rights under the 1974 stock option plan violated section 16(b) of the Securities and Exchange Act of 1934, 15 U.S.C.A. § 78p(b).
 
 
 13
 The plaintiffs asserted that the foregoing acts of the defendants which were not disclosed to shareholders or the Securities and Exchange Commission constitute violations of sections 10(b), 13(a) and 14(a) of the Securities and Exchange Act of 1934.
 
 
 14
 The plaintiffs also asserted pendent state law claims against the officers and directors of Gulf, who, it was alleged, knew or should have known of their own and others' malfeasance with respect to the diversion of corporate funds, for waste, misuse of corporate assets, breach of fiduciary duties, fraud and the negligent failure to seek recovery from Gulf's insurance carriers. And it was asserted that Price Waterhouse and Royce H. Savage, a former general counsel of Gulf, breached their professional and fiduciary duties owed to Gulf and its shareholders.
 
 
 15
 Finally, in a "Twelfth Cause of Action" it was alleged that the compromise and settlement and subsequent dismissal of Civil Action No. 74-493 brought by the Project in the District Court for the District of Columbia were fraudulently obtained and void and, therefore, must be set aside.
 
 
 16
 In answer to the allegations and claims contained in the consolidated amended complaint, the defendants denied liability for acts which they contended were performed in good faith in the carrying out of their corporate responsibilities and in the exercise of sound business judgment. They contended that they neither knew of nor should have known of the matters complained of before they were disclosed to the general public and that following the issuance of the McCloy Report, stricter internal procedures for auditing and reporting political contributions had been inaugurated and implemented within the corporation.
 
 
 17
 Among other defenses, the defendants asserted the bar of the applicable statutes of limitations, the absence of damage to the corporation caused by the transactions complained of and entitlement to indemnification from Gulf for any adverse judgment entered against them. They asserted shareholder approval and ratification of the 1974 stock option plan and the failure of the plaintiffs to make demand upon the directors or shareholders to enforce a cause of action based upon the directors' reduction, without shareholder approval, of compensatory stock option prices or to make the demand as to other causes of action required under Rule 23.1 of the Federal Rules of Civil Procedure.
 
 
 18
 The defendants further contended that there was no private cause of action for damages under section 13(a) of the Securities and Exchange Act of 1934 or under section 610 of the Federal Election Campaign Act. They contended that the plaintiffs lack standing to assert claims under section 10(b) or 14(a) of the Securities and Exchange Act absent allegations of fraud in connection with a purchase or sale of securities and shareholder approval of a corporate transaction on the basis of misleading proxy material.
 
 
 19
 On March 17, 1976, Price Waterhouse filed a motion in the district court to dismiss the complaint as to it for noncompliance with Rule 23.1, F.R.C.P. Oral argument on the motion was held September 15, 1976.
 
 
 20
 Opting to settle the case rather than proceed to trial, the parties, with the exception of Price Waterhouse, entered into a "Stipulation of Compromise and Settlement" and on September 29, 1976, petitioned the district court for its approval.
 
 
 21
 The stipulation provided for the termination of the settling defendants' liability to each other and to the plaintiffs as to all claims asserted or which might have been asserted in the complaint, the crossclaim[5] and a related complaint filed in the Court of Common Pleas of Allegheny County, Pennsylvania[6] based upon the matters alleged therein or directly or indirectly arising out of matters contained in the McCloy Report.
 
 
 22
 Gulf agreed to reimburse and indemnify the settling defendants, with certain qualifications in regard to Viglia[7] and Wild, as to their reasonable expenses, including counsel fees, incurred in connection with the consolidated action or any other action, judgment or penalty arising out of the matters contained in the McCloy Report. Gulf also agreed to the adoption of and further implementation of already initiated internal auditing and reporting procedures designed to avoid a recurrence of unlawful political contributions.
 
 
 23
 The North River Insurance Company, the insurance carrier under Gulf's directors' and officers' liability and corporate reimbursement policy, agreed to pay $2,000,000 to Gulf conditioned on the execution of releases by Gulf and the defendants named as insured in the policy.
 
 
 24
 Certain of the individual defendants agreed not to contest the rescission by Gulf's board of directors on July 13, 1976, of stock option rights and attendant stock appreciation rights previously granted them under the 1974 stock option plan and the board's denial of incentive compensation awards for 1975 amounting to $370,000. Gulf agreed to refuse delivery to other defendants of Gulf stock valued at $250,000 previously awarded them. Other Gulf employees, not defendants, consented to the denial of incentive compensation due them aggregating $23,882.28. A retired employee, Joseph E. Bounds, was denied all future payments to him under a 1964 agreement with Gulf. Gulf admitted reimbursement by recipients of illegal or unauthorized contributions from Gulf funds amounting to $57,261.55.
 
 
 25
 Lastly, based upon the complexity of the litigation, the competence of the attorneys and accountants involved and the benefits to Gulf and its shareholders from the compromise and settlement of the case, Gulf agreed not to oppose an application, with supporting data, to the district court by the plaintiffs' attorneys and accountants for payment by Gulf of their reasonable fees and reimbursement of their expenses in an amount not to exceed $600,000 for fees and $25,000 for expenses.
 
 
 26
 A summary of the settlement terms was sent to the more than 300,000 Gulf shareholders of record with directions to file in advance of a settlement hearing to be held November 18, 1976, their written objections, if any, to the settlement and notice of their intention to appear if they desired to do so. The district court, in addition, ordered the submission of proposed findings of fact, conclusions of law, drafts of opinions, judgments and orders along with briefs or memoranda in support of or in opposition to the proposed compromise and settlement.
 
 
 27
 Of the ten shareholders who filed written objections, only Holloway and the Project appeared at the settlement hearing. At that hearing the plaintiffs and Gulf, acting jointly, and the Project presented proposed findings of fact and conclusions of law pursuant to the prior direction by the court and the settlement's proponents and objectors were fully heard. At the conclusion of his presentation of objections, Holloway withdrew his opposition to the merits of the proposed settlement, restricting his continuing objections solely to the amounts awarded to counsel.
 
 
 28
 Following the conclusion of the settlement hearing on the morning of November 18, 1976, the district court entered an order approving the settlement terms as fair, reasonable and adequate and dismissed the complaint with prejudice as to the settling defendants. The district court's findings of fact and conclusions of law approving the settlement were filed on the next day.
 
 
 29
 Also, at the close of the settlement hearing, the court announced its decision with regard to Price Waterhouse's motion to dismiss and on the same day entered an order granting the motion and dismissing Price Waterhouse as a party defendant in the action.
 
 
 30
 On the afternoon of November 18, 1976, the district court conducted a hearing on the plaintiffs' application for accountants' and attorneys' fees and expenses. Holloway presented his objections in which the Project joined. The district court found the objective value of the time spent by the persons involved in representing the plaintiffs to be in the aggregate $407,429.50. That amount was increased by the court by $167,570.50 in consideration of such factors as the contingent nature of success in the litigation, the benefits achieved by the settlement terms and the quality of the services performed. The court accordingly found $575,000 to be representative of fair and reasonable fees. The court also approved reimbursement of the attorneys' and accountants' expenses in the amount of $32,777.95 and directed by order entered November 19, 1976, payment by Gulf of a total of $607,777.95 for fees and reimbursement of expenses of the plaintiffs' accountants and attorneys.
 
 
 31
 II. DISMISSAL OF PRICE WATERHOUSE & COMPANY AS A PARTY DEFENDANT
 
 
 32
 The plaintiffs' appeal at our No. 77-1156 is from the district court's dismissal of Price Waterhouse as a party defendant for noncompliance with Rule 23.1, F.R.C.P. In taking this action the district court held that the complaint failed to allege efforts by the plaintiffs to obtain action by Gulf's board of directors against Price Waterhouse and the reasons for their failure to obtain the action or for not making the effort as required by Rule 23.1.
 
 
 33
 In Hawes v. Oakland, 104 U.S. 450, 26 L.Ed. 827 (1882) the Supreme Court held (pp. 460-461)
 
 
 34
 "that before the shareholder is permitted in his own name, to initiate and conduct a litigation which usually belongs to the corporation, he should show, to the satisfaction of the court, that he has exhausted all the means within his reach to obtain, within the corporation itself, the redress of his grievances, or action in conformity to his wishes. He must make an earnest, not a simulated effort, with the managing body of the corporation, to induce remedial action on their part, and this must be made apparent to the court. If time permits, or has permitted, he must show, if he fails with the directors, that he has made an honest effort to obtain action by the stockholders as a body, in the matter of which he complains. And he must show a case, if this is not done, where it could not be done, or it was not reasonable to require it."
 
 
 35
 In Landy v. Federal Deposit Insurance Company, 486 F.2d 139 (3d Cir. 1973), cert. denied, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974), this court said (p. 146):
 
 
 36
 "As a general principle, the responsibility for determining whether or not a corporation shall enforce in the courts a cause of action for damages is, like other business questions, ordinarily a matter of internal management left to the discretion of the directors . . . Otherwise a litigious stockholder could easily intrude upon authority of those who are vested with responsibility for the operation of the corporation's business. Whether to forego an action or to bring suit for damages is a matter of business judgment. Such decision may involve not merely a consideration of legal principles but a balancing of business interests and relationships."
 
 
 37
 We pointed out that the rationale of this principle is reflected in Rule 23.1, F.R.C.P. which provides procedural implementation for the rule laid down in Hawes v. Oakland. Rule 23.1 provides, in substance, that a shareholder may not bring a derivative action to enforce a right of the corporation against a third party unless the corporation has failed to assert a right which might properly be asserted by it and the complaint alleges, with particularity, the efforts made by the shareholders to obtain corporate action and the reasons for failure to obtain it. The pertinent provisions of the rule in this regard are:
 
 
 38
 "The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for his failure to obtain the action or for not making the effort."
 
 
 39
 In attempting to show compliance with these provisions of Rule 23.1, the plaintiffs point to four letters summarized in the amended complaint and appended to it which, they contend, demonstrate a sufficient effort to apprise Gulf's board of directors of their desire to have the corporation institute an action for damages against Price Waterhouse. The four letters were written by an attorney representing two of the plaintiffs, Mr. and Mrs. Fred Horenstein, prior to the filing of their original complaint. The letters were addressed to James E. Lee, president of Gulf.
 
 
 40
 The first letter, dated November 30, 1973, was, substantially, a request for information by the shareholders as to the amounts and circumstances of Gulf's illegal political contributions and the subsequent repayment of them. The second letter, dated December 27, 1973, was an inquiry as to the payment by Gulf of any fines in connection with the illegal contributions and the corporation's intentions regarding reimbursement from the officers and directors responsible for making the contributions.
 
 
 41
 Neither of these letters was addressed to the board of directors of Gulf and neither contained any reference to Price Waterhouse. The two letters called for nothing more than a responsive communication from Lee, to whom they were addressed and, thus, did not constitute a demand by the Horensteins for action by the directors of Gulf against Price Waterhouse.
 
 
 42
 The third letter, dated January 21, 1974, contained what it stated was a "formal demand" that the board of directors seek reimbursement from the "responsible individuals" "for all damages" sustained by the corporation in connection with the payment of fines and injury to the corporation's reputation resulting from the illegal contributions. On its face the letter indicated that a copy of it was sent to the board of directors. However, Price Waterhouse was not mentioned in it and there was nothing in the letter suggesting that Price Waterhouse, Gulf's outside independent auditor, was intended to be included among the individuals referred to in the letter as responsible for damages incurred by the corporation. In fact, the plaintiffs admit that these first three letters were written without awareness of the possible culpability of Price Waterhouse. They argue, however, that the letters informed the directors of the basis of the claim they wished enforced by the corporation and that this was sufficient notice to them for the purposes of Rule 23.1.
 
 
 43
 Since, obviously, there can be no claim for damages against an unknown and unspecified party, the plaintiffs cannot mean that any of the first three letters or combination of them literally communicated to Gulf's directors the existence of a claim against Price Waterhouse which should be enforced by Gulf. Moreover, the request for action against the "responsible individuals" "for all damages" to Gulf does not, considered in the context of all three letters, suggest any liability on the part of Price Waterhouse to Gulf. It is completely lacking in the specificity which would give the directors a fair opportunity to initiate the action, which the shareholders subsequently undertook, which it is the purpose of the demand requirement of the rule to provide. See Halprin v. Babbitt, 303 F.2d 138, 141 (1st Cir. 1962); 3B Moore's Federal Practice pp. 23.1-81 to 23.1-82 (2d ed. 1977). The appellants argue that the directors were in a better position than the shareholders to make the investigation necessary to uncover wrongdoers. This argument, however, does not address the requirement of Rule 23.1 in issue or the vital point that subsequently the shareholders named Price Waterhouse as a defendant in their complaint without having first specifically demanded that the directors act against that defendant.
 
 
 44
 The fourth and last Horenstein letter was dated March 13, 1975. It referred to recent newspaper disclosures[8] and suggested that "the Directors should seek reimbursement for the contributions, all fines imposed, litigation and counsel expenses, lost interest, taxes and increased public relations costs expended to repair Gulf's damaged reputation and for the damage to Gulf's reputation."
 
 
 45
 This fourth letter, like the earlier ones, was addressed to Lee, Gulf's president. It does not appear that a copy of it was sent to the directors of Gulf. Again, no mention of Price Waterhouse was made in the letter. The opening sentence states that the Horensteins "renew and expand their demand of January 21, 1974." The expansion referred, perhaps, to the increased dollar amounts of reimbursement which the corporation should seek in view of the 1975 disclosures and the enlarged scope of related damages to Gulf. The "expanded" demand, if such it was, referred, however, only to reimbursement from "responsible individuals." Under the facts of the case, it was not error for the district court to conclude that this letter, like the others, did not encompass a demand to bring suit against Price Waterhouse and thus did not satisfy Rule 23.1.
 
 
 46
 The plaintiffs contend that if the allegations in the complaint are insufficient in respect to the requirement of Rule 23.1, the district court erred in refusing to grant their request for leave to amend or supplement the complaint to include additional demand letters written by various of the plaintiffs to Gulf's directors or their counsel after the filing of the senders' complaints. The district court did not abuse its discretion in this regard. The contemplated showing of demand made upon the directors after the filing of the shareholders' derivative complaints could not have satisfied the demand requirement of the rule. See McDonough v. First National Boston Corp., 416 F.Supp. 62, 65 (D.Mass.1976). For such a demand would not have afforded the directors the opportunity to make the judgment in the first instance whether and in what manner action should be taken. As the court deciding Lucking v. Delano, 117 F.2d 159, 160 (6th Cir. 1941), stated, "Obviously the filing of the complaint cannot be regarded as a demand to sue, for by starting the action appellants have usurped the field." The same vice clearly infects demands made after the filing of the complaint. To hold that demands to satisfy Rule 23.1 may be made on the directors after a derivative suit has been initiated would be to reduce the demand requirement of the rule to a meaningless formality. See In re Kauffman Mutual Fund Actions, 479 F.2d 257, 263 (1st Cir.), cert. denied, 414 U.S. 857, 94 S.Ct. 161, 38 L.Ed.2d 107 (1973).
 
 
 47
 The plaintiffs argue that Rule 23.1 is intended to benefit the corporation and its directors only and that, therefore, Price Waterhouse lacks standing to raise the defense of noncompliance with the Rule, particularly since counsel representing Gulf and several of its directors waived the right of those defendants to assert a defense based upon the rule. Price Waterhouse contests the validity of Gulf's waiver which was, apparently, not the result of official action by the board of directors. This question we need not decide, however, since, assuming the effectiveness of the waivers as to the parties which executed them, we are convinced that they would not affect Price Waterhouse's rights. For it is well settled, contrary to the plaintiffs' contention, that defendants other than the corporation whose rights the shareholder plaintiffs are seeking to vindicate may successfully raise the defense of failure to comply with Rule 23.1. See Brody v. Chemical Bank,517 F.2d 932 (2d Cir. 1975); Landy v. Federal Deposit Insurance Corp., 486 F.2d 139 (3d Cir. 1973), cert. denied, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974); In re Kauffman Mutual Fund Actions, 479 F.2d 257 (1st Cir.), cert. denied, 414 U.S. 857, 94 S.Ct. 161, 38 L.Ed.2d 107 (1973); Ash v. International Business Machines, Inc., 353 F.2d 491 (3d Cir. 1965), cert. denied, 384 U.S. 927, 86 S.Ct. 1446, 16 L.Ed.2d 531 (1966); Meyers v. Keeler, 414 F.Supp. 935 (W.D.Okl.).
 
 
 48
 We are in accord with the conclusion of the district court that the amended complaint failed to allege an adequate demand upon the directors of Gulf for action against Price Waterhouse or any sufficient reason for failing to make such demand or the reasons for the plaintiffs' failure to obtain from the directors the action they now say they sought against Price Waterhouse. The amended complaint, therefore, failed to comply with the express requirements of Rule 23.1 which are mandatory and the district court rightly acted for that reason. Its order of dismissal of Price Waterhouse as a party defendant entered November 18, 1976, must accordingly be affirmed.
 
 III. APPROVAL OF THE SETTLEMENT OF THE ACTION
 
 49
 The Project responded to notice of the proposed settlement of the Gulf shareholders' consolidated derivative action, which it received as owner of two shares of Gulf stock, by filing objections to the settlement proposal on behalf of itself and three other Gulf shareholders who, with the Project, are the plaintiffs in the derivative action instituted on behalf of Gulf which, as we have seen, is presently pending in the District Court for the District of Columbia. The three other Gulf shareholders referred to in the Project's notice of objections to the settlement subsequently denied any intention to oppose the settlement agreement. The Project took the depositions of two defendants, two attorneys who had represented Gulf in 1974 in the negotiations aimed at terminating the derivative action in the District of Columbia, and an attorney for the plaintiffs. It was denied permission to take defendant Wild's deposition.[9] The five depositions which were taken were filed in the district court and the Project presented its objections orally at the settlement hearing. The Project appeals at our No. 77-1157 from the district court's order of November 18, 1976, approving the settlement and its order of November 19, 1976, awarding the plaintiffs' attorneys' and accountants' fees and reimbursement of expenses. Shareholder Holloway also appeals from the fee order of November 19th and the objections of both the Project and Holloway to that order are discussed in Part IV of this opinion.
 
 
 50
 The Project seeks reversal of the district court's order of November 18th approving the settlement on the following grounds: (1) that the district court abused its discretion in approving the proposed settlement in view of the fact that it provides for a general release of the individual defendants' liability to Gulf which purports to release them from liability for matters asserted against them in the suit being prosecuted by the Project in the District Court for the District of Columbia in which they are named defendants, (2) that the district court abused its discretion in approving the proposed settlement in view of the fact that it provides for the reimbursement by Gulf of the litigation expenses, including attorneys' fees, of the individual defendants, (3) that the district court erred in approving the settlement because it conferred no net benefit on Gulf, and (4) that the district court failed to subject the settlement to an independent judicial scrutiny. To the consideration of these objections we now turn.
 
 
 51
 The Project's original complaint against Gulf, Wild and other directors and officers of Gulf, filed March 27, 1974, in the District of Columbia court, sought, as we have stated earlier, to recover for Gulf the fines and costs incurred by Gulf as a result of the unlawful corporate contributions, totaling $125,000, to the campaigns of three contenders for the presidency of the United States in 1972. The suit was dismissed in conjunction with the court's approval of the terms of a stipulation entered into by the parties on June 27, 1974, under which Wild agreed to pay Gulf $25,000 in exchange for Gulf's release of all claims against him and under which the board of directors of Gulf agreed that the corporation would not rehire Wild, other than on an emergency basis, for five years following the dismissal of the complaint without the board's approval and notification of the rehiring of Wild to the plaintiffs' counsel. On August 3, 1976, as we have seen, the order of dismissal was vacated and the action was reinstated.
 
 
 52
 An amended complaint was filed in the District of Columbia suit on August 4, 1976. The amended complaint sought, in addition to the relief requested in the original complaint, the costs and damages to Gulf resulting from fraud allegedly perpetrated by the defendants against Gulf and the court in connection with the procurement of the judgment subsequently vacated. The complaint averred the basis of the fraud to be the deliberate failure of Gulf officials to notify Gulf shareholders of the terms of the settlement agreed to in 1974 before its approval by the court, Wild's appropriation from Gulf's funds under his control during the settlement negotiations of the $25,000 with which he intended to discharge his liability to Gulf under the terms of the 1974 settlement, and Gulf's rehiring of Wild in August 1974.
 
 
 53
 The Project concedes that the settlement of the claims in controversy in the suit now before us will eliminate their further litigation in the District Court for the District of Columbia under the doctrine of res judicata, citing Stella v. Kaiser, 218 F.2d 64 (2d Cir. 1954), cert. denied, 350 U.S. 835, 76 S.Ct. 71, 100 L.Ed. 745 (1955).9a The Project contends, however, that the claims of fraud based upon Wild's so-called "sham" payment to Gulf and Gulf's rehiring of Wild are distinctly different from any claims pleaded in the suit before us and would survive the settlement of this suit were it not for the release provisions of the settlement. The parties to the suit before us disagree, being of the view that the issues and claims raised in the District of Columbia case are all duplicative of those raised in the consolidated action before us.
 
 
 54
 The Project asserts that it was error for the district court to approve the broad release provisions of the settlement because they wrongfully seek to settle serious issues of fraud being litigated in another forum. At the least, the Project submits, the court should have independently evaluated the Project's separate and distinct claims.
 
 
 55
 We cannot agree that the district court failed to take into account and evaluate the claims presented in the Project's District of Columbia suit. The record before the court included a copy of the Project's amended complaint pending in the District Court for the District of Columbia, depositions taken by the Project in furtherance of the successful establishment of the claims asserted in the complaint and a copy of the McCloy Report which contains an objective discussion of Gulf's rehiring of Wild and of Wild's payment to Gulf of borrowed corporate funds. The Project was given every opportunity to present and support its position in this regard.
 
 
 56
 So far as the releases are concerned, we note that general releases executed extrajudicially are ordinarily enforced by the courts according to their terms. See Ruskay v. Waddell, 552 F.2d 392, 396-398 (2d Cir. 1977); Three Rivers Motors Co. v. Ford Motor Co., 522 F.2d 885, 895-896 (3d Cir. 1975); DeHart v. Richfield Oil Corp., 395 F.2d 345, 348 (9th Cir. 1968). Such releases are binding in Pennsylvania even as to claims unknown at the time of the execution of the releases if that was their intended scope. Three Rivers Motors Co. v. Ford Motor Co., supra at 896; Sears, Roebuck and Co. v. Jardel Co., 421 F.2d 1048, 1050-1051 (3d Cir. 1970). We think, therefore, that the district court was not precluded from approving the settlement of this shareholders' derivative action because it included an agreement by the parties to release claims other than those pleaded in the complaint where it found, as it did here, that the settlement as a whole was fair and reasonable. See 3B Moore's Federal Practice p. 23.1-141. See also Winkelman v. General Motors Corp., 48 F.Supp. 490, 495-496 (S.D.N.Y.1942). We think that the question of the actual effect of the general releases on the District of Columbia suit is one to be resolved in that proceeding. See Delahanty v. Newark Morning Ledger Co., 26 F.Supp. 327, 328-329 (D.N.J.1939). We are not persuaded to the contrary by the opinion of the district court in Herbst v. International Tel. & Tel. Corp., 72 F.R.D. 85, 91-92 (D.Conn.1976), cited by the Project.
 
 
 57
 The Project contends that Gulf's agreement under the terms of the settlement to reimburse and indemnify the individual defendants for their reasonable litigation expenses incurred in the present suit or in defense of other claims related to the matter in suit was unjustified and excessive, since it rendered the settlement of no net benefit to Gulf especially when considered in the light of Gulf's agreement not to oppose the award, payable by Gulf, of not in excess of $625,000 for the fees and expenses of the plaintiffs' attorneys and accountants. The Project argues that for this reason also the district court erred in approving the settlement. The attack of the Project and Holloway upon the actual award of $607,777.95 for such fees and expenses is discussed in Part IV of this opinion. For present purposes we may assume, in considering whether the district court abused its discretion in approving the settlement, that the recovery by Gulf would be subject to a payment by Gulf for such fees and expenses of $625,000,[10] the figure in which Gulf acquiesces.
 
 
 58
 With respect to Gulf's agreement to reimburse the defendants' litigation expenses we see no abuse of discretion by the district court when it declined on that account to disapprove the settlement which it found otherwise beneficial to Gulf. For Gulf would appear to be obligated under its bylaws thus to indemnify those defendants whose good faith in connection with the transactions involving the payment of corporate funds for political purposes had not been disproved. The agreement of Gulf in the settlement to do what it was already obligated to do regardless of the settlement cannot be considered in determining the extent of the settlement's benefit to it even though it should elect to use funds derived from the settlement to meet its obligations. Moreover, those defendants who were insured under the North River Insurance Company policy relinquished in the settlement their right to claim reimbursement under the policy. This was an additional consideration which in itself supported Gulf's agreement to assume this obligation.
 
 
 59
 As we have said, the Project urges that the settlement was of no net benefit to Gulf when considered in the light of the agreement to reimburse the defendants' litigation expense and the allowance of the fees and expenses of the plaintiffs' attorneys and accountants. We have shown that the defendants' litigation expenses may not properly be considered in this connection. It remains to consider whether the settlement was of net benefit to Gulf when considered in the light of its agreement not to oppose its payment of plaintiffs' counsel fees and expenses up to $625,000.
 
 
 60
 The district court found as a fact that the fund to be derived by Gulf from the settlement was made up of the following:
 
 
 61
 (a) The rescission of certain stock option rights held by three of the defendants representing a total of 143,750 shares of Gulf stock, which rights were valued by Bernd Bildstein, a certified public accountant, at $857,726.61.
 
 
 62
 (b) The denial of incentive compensation awards in the aggregate amount of $370,000 held by four of the defendants, which might have been paid under Gulf's Incentive Compensation Plan for 1975.
 
 
 63
 (c) The denial to two of the defendants of a total of $250,000 worth of shares of Gulf stock previously awarded to them under the Incentive Compensation Plan.
 
 
 64
 (d) The denial to certain nondefendant Gulf employees, with their consent, of benefits aggregating $23,882.28 due and payable to them under the Incentive Compensation Plan.
 
 
 65
 (e) The withholding by Gulf from a former employee not a defendant of future annual payments of $3,918.20 each due him for the remainder of his life under an existing agreement.
 
 
 66
 (f) The refund to Gulf of certain illegal or unauthorized contributions from Gulf funds in the amount of $57,261.55.
 
 
 67
 (g) The receipt from North River Insurance Company of the sum of $2,000,000.
 
 
 68
 On the basis of these findings, the district court concluded that the settlement fund was quantifiable and was in excess of $3,500,000, pointing out that this figure resulted from the simple arithmetical exercise of adding up the individual items which we have detailed. Deducting from this sum the amount of $625,000 which Gulf agreed not to oppose for plaintiffs' counsel fees and expenses would leave a net pecuniary benefit to Gulf in excess of $2,875,000, an amount quite adequate, as we shall see, to justify an award of reasonable counsel fees.
 
 
 69
 We turn then to consider the district court's determination that the settlement conferred a pecuniary benefit in excess of $3,500,000 upon Gulf. In passing, we note that the district court determined that substantial nonmonetary benefits accrued to the corporation under the settlement in the form of provisions in the agreement for the establishment of internal corporate reforms designed to prevent the making of unlawful political contributions and to insure that contributions by Gulf to support the propaganda efforts in the United States of foreign political interests are approved by the Gulf board of directors and disclosed to Gulf's shareholders.
 
 
 70
 It is argued that the district court erred in assigning a value in excess of $3,500,000 to the monetary benefit obtained for Gulf under the settlement and in finding that the nonmonetary benefits to Gulf were substantial. It is contended that the court erred in valuing the defendants' releases of their claims against Gulf resulting from the cancellation of bonuses and stock option rights at the face value of the rights released. It is argued that no evidence was offered in the district court to show to what extent, if any, the shareholders' derivative suit influenced the board of directors of Gulf when on July 13, 1976, the board cancelled the bonuses and stock options in question. Further, it is argued that there was no evidence offered to indicate that the individual defendants affected by the board's action would have pursued their claims against the corporation or would have been successful if they had chosen to do so.
 
 
 71
 We think the district court was justified in evaluating the defendants' releases of their claims against Gulf at the face value of the cancelled rights giving rise to the claims. Entirely aside from the question of whether or not the board's action on July 13, 1976, was influenced by the pendency of the shareholders' derivative suit and the settlement negotiations, then in progress, the resulting claims against Gulf constituted valuable rights. Their release may well have represented a monetary benefit to Gulf greater than their face value in view of the costs of litigation and other considerations. The failure of the defendants to prosecute the claims up to the time of the settlement is not a significant factor in determining their value as long as the claims remained viable. The district court's acceptance of the face value of the claims as the value to Gulf of the releases was, therefore, not erroneous.
 
 
 72
 It is also contended that the district court erred in not reducing the amount of the monetary benefit to Gulf resulting from the settlement by the cost to Gulf of the McCloy Report and by Gulf's obligation to pay its own attorneys approximately $255,000, the cost of their services in connection with the present suit and the defendants' attorneys' fees amounting to approximately $1,500,000.
 
 
 73
 The argument that the $3,000,000 which it cost Gulf to produce the McCloy Report should offset the amount of the settlement fund benefiting Gulf is without merit. Gulf's commitment to undertake the report was made before the derivative actions consolidated in the suit before us were filed and its obligations to finance the report exists independently of the present suit. The plaintiffs' use of the report to aid them in bringing about the settlement of the derivative action does not change that result. This item of expense to Gulf, therefore, cannot offset the figure arrived at by the district court as constituting the monetary benefit to Gulf under the settlement.
 
 
 74
 The argument that the net benefit to Gulf under the settlement terms should be determined in the light of the aggregate of the attorneys' fees resulting from the litigation and payable by Gulf is also without merit. Gulf is obligated to compensate its own attorneys for their services regardless of the outcome of the shareholders' derivative suit or the existence of a settlement fund. This separate obligation of Gulf should, therefore, have no effect on the amount of the fund constituting a benefit to Gulf for purposes of the plaintiffs' entitlement to attorneys' fees. We have already pointed out that Gulf's existing obligation to indemnify the defendants for their counsel fees and other litigation expenses resulting from the present suit and the matters involved in it cannot be considered in determining the net benefit to be derived by Gulf from the settlement.
 
 
 75
 The district court, therefore, was justified in not reducing the size of the monetary benefit derived by Gulf from the settlement by the cost of the McCloy Report, its independent obligation to compensate its own attorneys or its obligation under the settlement to reimburse the defendants for their attorneys' fees. The findings of fact of the district court in this regard have adequate support in the record. We conclude that the court did not err in determining that the monetary benefit to Gulf was in excess of $3,500,000.
 
 
 76
 Turning to the district court's determination that the settlement was fair and reasonable, we bear in mind that the scope of our review is very limited. For the district court has wide discretion in making that decision, Bryan v. Pittsburgh Plate Glass Co., 494 F.2d 799, 801 (3d Cir.), cert. denied, 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974), as long as the court takes into account all of the relevant factors. See Girsh v. Jepson,521 F.2d 153, 156-157 (3d Cir. 1975). While in Girsh v. Jepson we discussed the necessity of considering such factors in determining the fairness of the settlement of a class action in order to protect the rights of absent members of the class of plaintiffs, it is clear that the same factors are relevant in a shareholders' derivative suit. It is true, of course, that the interests of the class of shareholders in such a suit are indirect, rather than direct, and are subject to the vicissitudes of the corporate business. But their interests must nonetheless be considered with those of the corporation itself and the standards annunciated in Girsh v. Jepson for class suit settlements have accordingly been applied, although perhaps with somewhat less rigor, in the settlement of shareholders' derivative suits. See In re Pittsburgh L.E.R. Co., Etc., 543 F.2d 1058, 1070 (3d Cir. 1976). Indeed Girsh v. Jepson itself involved both class and derivative claims. See also Greenspun v. Bogan, 492 F.2d 375, 378 (1st Cir. 1974); Norman v. McKee, 431 F.2d 769, 774 (9th Cir. 1970), cert. denied, 401 U.S. 912, 91 S.Ct. 880, 27 L.Ed.2d 811 (1971).
 
 
 77
 The principal factor to be considered in determining the fairness of a settlement concluding a shareholders' derivative action is the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest. In re Pittsburgh & L.E.R. Co., Etc., 543 F.2d 1058, 1068 (3d Cir. 1976). The adequacy of the recovery provided the corporation by the settlement must be considered in the light of the best possible recovery, of the risks of establishing liability and proving damages in the event the case is not settled, and of the cost of prolonging the litigation. See Girsh v. Jepson, 521 F.2d 153, 156-157 (3d Cir. 1975).
 
 
 78
 Given the amount of unlawfully disbursed corporate funds alleged to total $18,800,000 and taking into consideration the risks of establishing liability and damages, set forth at length in the district court's findings of fact and conclusions of law, we cannot say that it was an abuse of the district court's discretion to conclude that $3,500,000 represented a fair and reasonable settlement amount even without taking into consideration the additional nonmonetary benefits to Gulf referred to but not valued by the district court. The value of the Project's claim for damages for fraud, asserted by the Project to be $150,000 to $160,000, excluding punitive damages, which may have to be given up by Gulf under the release provisions of the settlement, clearly is not so great as materially to affect the fairness determination. Likewise the payment of up to $625,000 in plaintiffs' counsel fees and expenses which was contemplated by the settlement was, as we have seen, not sufficient to deprive Gulf of a net benefit from the settlement. For this payment would still leave a net pecuniary benefit to Gulf from the settlement of upwards of $2,875,000 without regard to the nonmonetary benefits which it also received. This figure, which is approximately 15% of the maximum amount of unlawfully disbursed corporate funds alleged to be involved in the suit, can hardly be said to provide a grossly inadequate benefit to Gulf in view of the uncertainties of this litigation. See City of Detroit v. Grinnell Corp., 495 F.2d 448, 455 (2d Cir. 1974). Certainly it disproves the contention that no net benefit will be derived by Gulf from the settlement.
 
 
 79
 One of the factors to be considered in determining the fairness of a settlement disposing of a class action is the reaction of the members of the class. See Girsh v. Jepson, 521 F.2d 153, 156-157 (3d Cir. 1975). As we have seen, the Girsh criteria apply also to the approval of the settlement of a shareholders' derivative suit. Here the overwhelming majority of Gulf shareholders have not objected to the settlement and Gulf, for the benefit of which the suit was filed, has agreed to its terms.
 
 
 80
 Bearing in mind all of the factors the $2,000,000 contribution to Gulf by its insurer under a directors' and officers' liability insurance policy in exchange for its release from further liability under the policy,[11] the agreements of the individual defendants to give up their claims against Gulf for compensation and stock option rights valued by the district court at approximately $1,500,000, the additional cost of protracted litigation, the risk of successful prosecution of the claims given up, the fact that so very few shareholders objected to the settlement, the corporation's approval of the settlement, and the fact that the settlement provides a substantial net benefit to Gulf after payment of plaintiffs' counsel fees and expenses we cannot say that the district court abused its discretion in approving the settlement as a fair compromise and settlement of the action before it.
 
 
 81
 Since the pecuniary benefits to Gulf under the settlement are adequate to support this conclusion, we need not consider the question of whether the district court erred in categorizing the nonmonetary benefits obtained for the corporation under the settlement as substantial.
 
 
 82
 The Project's assertion that the district court failed to make an independent evaluation of the fairness of the settlement terms is not substantiated by the record. The district court stated at the commencement of the settlement hearing that it had "preliminarily" approved the proposed settlement. However, there is no indication in the record that the court's preliminary or tentative approval prevented its fair and full consideration of the objections to the settlement presented at the hearing. The Project does not contend that it was denied a full opportunity to present its case. It does assert, however, that the district court adopted and filed on November 19, 1976, as its findings of fact and conclusions of law, findings and conclusions prepared by counsel for the parties to the action and that this practice was disapproved by this court in Roberts v. Ross, 344 F.2d 747 (3d Cir. 1965).
 
 
 83
 In Roberts v. Ross we strongly disapproved the practice of a trial judge announcing his decision and thereafter requesting the prevailing party to prepare findings of fact and conclusions of law to be signed by the judge in support of his previously announced decision. Our views in this regard are in accord with those of many other courts, including the Supreme Court, see United States v. El Paso Natural Gas Co., 376 U.S. 651, 656-657, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964), and we adhere to them. But that is not this case. Here the district court prior to the hearing directed all the parties, including the objecting shareholders, to present it with proposed findings of fact and conclusions of law and both the Project and the parties to the action did so before the court announced its decision. Thus, the district court had the proposed findings and conclusions of both the parties and the Project before it during the hearing on the approval of the settlement and it obviously considered them in reaching its final decision, adopting those presented by the parties as findings and conclusions which represented its considered views. This is a practice of which we do not disapprove although the adoption of a party's proposed findings and conclusions by the court without change may cause us to examine them more narrowly, as we have done in this case. Roberts v. Ross, 344 F.2d 747, 752 (3d Cir. 1965). We find no error in this regard.
 
 
 84
 We are satisfied that the district court exercised its independent judgment in determining that the settlement was fair and beneficial to Gulf, that the determination did not involve an abuse of the discretion vested in the district court in this regard, and that the order of November 18, 1976, approving the settlement should, therefore, be affirmed.
 
 
 85
 IV. AWARD OF ATTORNEYS' AND ACCOUNTANTS' FEES AND EXPENSES
 
 
 86
 Under the "American" rule ordinarily applied in our courts, a prevailing litigant is not entitled to recover attorneys' fees from a losing party absent statutory authority. Alyeska Pipeline Co. v. Wilderness Society, 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). However, the courts, exercising their equitable powers, have permitted a plaintiff whose efforts have created a fund benefiting others as well as himself to recoup some of the costs of the litigation, including attorneys' fees, out of the common fund or directly from the other parties enjoying the benefits who are required to pay their proportionate share of the costs. Alyeska Pipeline Co. v. Wilderness Society, 421 U.S. 240, 257, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); Trustees v. Greenough, 105 U.S. 527, 26 L.Ed. 1157 (1882). The plaintiffs in a shareholders' derivative action may, thus, recover their expenses, including attorneys' fees, from the corporation on whose behalf their action is taken if the corporation derives a benefit, which may be monetary or nonmonetary, from their successful prosecution or settlement of the case. Mills v. Electric Auto-Lite Co., 396 U.S. 375, 391-395, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); Levine v. Bradlee, 378 F.2d 620, 622 (3d Cir. 1967).
 
 
 87
 In the present case, as we have seen, the district court awarded to the attorneys and accountants of the plaintiffs the total sum of $607,777.95 for fees and reimbursement of expenses to be paid by Gulf. Pat S. Holloway, at our No. 77-1158, and the Project, at our No. 77-1157, appeal from the order making this award. Their contentions are essentially that the settlement did not result in a net benefit to Gulf and that, therefore, the plaintiffs are not entitled to any award of attorneys' fees and expenses. In the alternative, they contend that the district court failed to adhere to the standards set forth in Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp., 487 F.2d 161 (3d Cir. 1973) (Lindy I ), and Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp., 540 F.2d 102 (3d Cir. 1976) (Lindy II ), and erred in awarding fees in excess of the objective value of the attorneys' services.
 
 
 88
 In Part III of this opinion, we have discussed the appellants' contention that the award of attorneys' fees and expenses left Gulf without any net benefit from the settlement. For the reasons there explicated, we have concluded that this contention is without merit and that the district court did not err in approving the settlement as fair and beneficial to Gulf.[12] It follows that some award of plaintiffs' attorneys' fees and expenses was justified. This brings us to the appellants' alternative contention that even if there was a benefit to Gulf justifying an award of attorneys' fees in this case, the district court nonetheless abused its discretion in awarding excessive fees and in failing to follow the standards for determining the amount of such fees set forth in Lindy I and II, supra.
 
 
 89
 Although we recognize that the presence and active involvement of the corporation against which an award of the plaintiffs' attorneys' fees and other litigation costs may be assessed distinguishes a shareholders' derivative suit from a class action for purposes of the fee award, we, nevertheless, agree with the appellants that the guidelines for arriving at an appropriate award established in the Lindy cases, although they dealt with a class action, are applicable to a shareholders' derivative suit. Similar standards have been applied to shareholders' derivative suits in other circuits. See Ramey v. Cincinnati Enquirer, Inc., 508 F.2d 1188, 1196 (6th Cir. 1974), cert. denied, 422 U.S. 1048, 95 S.Ct. 2666, 45 L.Ed.2d 700 (1975); Green v. Transitron Electronic Corp., 326 F.2d 492, 496 (1st Cir. 1964). In this circuit, our policy is to require the application of the Lindy criteria to the extent reasonably possible in any case in which the district court is called upon to make an award of attorney's fees. See Kutska v. California State College, 564 F.2d 108, 112 (3d Cir. 1977); NBO Industries Treadway Cos., Inc. v. Brunswick Corp., 523 F.2d 262, 279 (3d Cir. 1975), vacated on other grounds sub nom. Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). The district court's award of attorneys' fees, which is, otherwise, a matter within its discretion, is, therefore, subject to review to determine whether the court adhered to the Lindy guidelines in arriving at the amount of the award.
 
 
 90
 We do not, however, apply to this shareholders' derivative suit the suggestion articulated in Prandini v. National Tea Co., 557 F.2d 1015, 1021 (3d Cir. 1977), a class action, that the district court require that the approval of the settlement of the damage aspect of a case involving the creation of a fund precede the consideration of attorneys' fees. In Prandini the district court was asked to approve the settlement of a class action under which the defendant agreed to pay a specific amount to the class and a separate sum to the plaintiffs' attorneys. These two amounts together constituted one recovery fund from the viewpoint of the defendant who could have little interest in its allocation between the attorneys and their clients. The plaintiffs' attorneys negotiating the settlement, on the other hand, were subject to an obvious conflict of interest with the class in making the allocation.
 
 
 91
 In the present case, Gulf, as part of the settlement, has agreed not to oppose an application for the plaintiffs' attorneys' fees not exceeding $600,000 and expenses not over $25,000. Gulf, as the real party in interest and the recipient of the fund created under the settlement, is not in a position of indifference, as was the defendant in Prandini, to the amount which it must pay the plaintiffs' attorneys for fees and expenses. On the contrary, it has an interest in retaining for itself as much of the settlement fund as possible. Moreover, here there is no "one fund" settlement giving rise to a conflict such as we condemned in Prandini. Indeed, even had Prandini been decided prior to the district court's approval of the settlement and award of fees in the present case we would not deem it controlling.
 
 
 92
 In this circuit, as we have already pointed out, the district court, in the exercise of its discretion to award reasonable attorneys' fees in an appropriate case, is required to follow the guidelines for determining the reasonable value of the attorneys' services set forth in the Lindy cases. Moreover, we have held that failure of the district court to follow these guidelines constitutes an abuse of discretion. Lindy II, 540 F.2d 102, 116; Merola v. Atlantic Richfield Company, 493 F.2d 292, 295 (3d Cir. 1974). Under these guidelines the court is required first to arrive at the objective value of the individual attorneys' services by multiplying their hours of work by their normal billing rates per hour. The resulting basic or "lodestar" figure may be increased or decreased depending upon the applicability of other factors, primarily, the contingent nature of success in the litigation and the quality of the attorneys' efforts. The district court must make a separate inquiry and findings of fact with respect to each of those factors. Lindy II, 540 F.2d 102, 116. Lindy II requires that if the district court decided that consideration of the contingency of success justifies a change in the basic fee, it must indicate the elements of contingency involved, examples of which it mentions, 540 F.2d at 117. Also, it must state the specific amount of the increase or decrease to be made in the fees by reason of the contingency feature and the reasons supporting such increase or decrease. Lindy II, 540 F.2d 102, 117. The same procedure must be followed in evaluating the quality of the attorneys' work with a view to an increase or decrease in the lodestar figure to reflect the effect of that factor. Lindy II, 540 F.2d 102, 117-118.
 
 
 93
 The district court's calculation of the objective value of the plaintiffs' attorneys' services benefiting Gulf is not in dispute. The court accepted, with some modification,[13] the statement of the hours spent on the case by the various attorneys, accountants and paraprofessionals and the normal hourly billing rates of those individuals contained in the plaintiffs' verified petition for fees. The court found that the aggregate objective value of the services of all the individuals entitled to compensation amounted to $407,429.50.
 
 
 94
 The district court then applied percentage increases, ranging from 7% to 82%, to the lodestar figures for the various lawyers and accountants involved. The aggregate increase over the total produced by the lodestar figures brought the fee award to $575,000, with an award of $32,777.95 for reimbursement of expenses producing a total of $607,777.95 which the court awarded to the attorneys and accountants of the plaintiffs for their fees and expenses.
 
 
 95
 Although the district court pointed out several factors which might permit alteration of the lodestar figures[14] at which it had arrived, it failed to make the necessary findings with respect to its alteration of the basic fees which are required by Lindy II, 540 F.2d 102, 116-117. Nor did it articulate the reasons for its increase over the lodestar figures with the specificity required by Lindy II, either as to the factors which entered into its decision to grant the increase or the amount and basis of the increase attributable to each factor. The order of the district court awarding the plaintiffs' attorneys' and accountants' fees and reimbursement of expenses amounting to $607,777.95 must, therefore, be vacated and the case remanded to permit the required findings to be made and the basis of the ultimate award articulated in accordance with the guidelines of Lindy I and II. The district court may, of course, take such further evidence, if any, as it deems necessary. We emphasize that our decision in this regard relates only to the standards and procedures utilized and articulated by the district court in arriving at its fee award. It will be time enough to consider the amounts awarded when and if an appeal is taken from the ultimate action of the district court following remand. We need only here reiterate that in fixing the amount to be awarded after making the findings required by Lindy I and II, the district court is vested with wide discretion.
 
 
 96
 The order of the district court entered November 18, 1976, dismissing Price Waterhouse & Company as a party defendant in the action will be affirmed.
 
 
 97
 The order of the district court entered November 18, 1976, approving the terms of the compromise and settlement as fair, reasonable and adequate, and dismissing the complaint as to the settling defendants, being all of the defendants except Price Waterhouse & Company, will be affirmed.
 
 
 98
 The order of the district court entered November 19, 1976, awarding fees to the attorneys and accountants of the plaintiffs in the total sum of $575,000 and reimbursement of their expenses in the total sum of $32,777.95 and directing the payment thereof by Gulf Oil Corporation will be vacated and remanded to the district court for further proceedings not inconsistent with this opinion.
 
 
 
 [1]
 Four of the eight actions were filed in the District Courts for the District of Massachusetts, the Southern and Eastern Districts of New York and the Southern District of Texas. The remaining four suits were filed in the District Court for the Western District of Pennsylvania
 
 
 [2]
 When the failure of the settling parties to notify Gulf shareholders of the settlement terms prior to the court's approval of them was brought to the court's attention, it vacated its prior order with the consent of the parties and reinstated the action
 
 
 [3]
 Bahamas Exploration Company, Ltd. was dissolved in August 1973
 
 
 [4]
 John J. McCloy, a partner in the New York law firm of Milbank, Tweed, Hadley & McCloy, was chairman of the Review Committee. The other two members of the committee were Beverley Matthews and Nathan W. Pearson
 
 
 [5]
 In his answer to the complaint defendant Royce H. Savage appended a crossclaim against the other defendants for contribution or indemnification in the event that his liability as to any claim was successfully established
 
 
 [6]
 A shareholder's derivative complaint based upon allegations similar to those alleged in the instant consolidated complaint filed by Shlensky on June 19, 1975, C.D. 75-14106
 
 
 [7]
 The defendant, William C. Viglia, was the comptroller of Bahamas Exploration Company, Ltd. until its liquidation in 1973
 
 
 [8]
 The letter mistakenly referred to the newspapers of March 12, 1974, obviously meaning newspapers of March 12, 1975
 
 
 [9]
 The district court refused to permit either the plaintiffs or the Project to take Wild's deposition because of Wild's indication to the court that he would assert a Fifth Amendment right not to testify in view of the pendency of a criminal action against him in the District of Columbia and open investigations in the office of the Watergate Special Prosecutor possibly leading to other criminal action against him
 9a "To be sure, there are overlapping issues in both PCR v. Gulf and the action below (see A. 401). The overlapping issues settled below are effectively eliminated from contention in PCR v. Gulf by the res judicata doctrine, which operates to put an end to repetitious causes of action in different lawsuits between the same parties. Settlement of one shareholders' derivative suit is conclusive in a second suit as to the same questions that were raised or could have (sic) raised in the first suit. See, Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948); Stella v. Kaiser, 218 F.2d 64 (2d Cir. 1954), cert. denied, 350 U.S. 835, 76 S.Ct. 71, 100 L.Ed. 745 (1955)."
 
 
 [10]
 The total amount actually awarded, it will be recalled, was less than this, namely, $607,777.95
 
 
 [11]
 There is an indication in the record that North River Insurance Company was considering, at the time of the settlement negotiations, an attempt to have this policy rescinded on the ground of Gulf's failure to make mention in its application for the policy made on June 7, 1976, of events which were then known to it. There was thus the possibility that, absent the settlement, recovery on the policy might have been denied
 
 
 [12]
 In reaching this conclusion, we found it unnecessary, in the light of the substantial pecuniary benefit involved, to consider the value of the nonmonetary benefits also found to be involved. We note, however, that where an intangible benefit is used as a measure of the value of an attorney's work permitting an upward adjustment of fees, the district court must attempt to evaluate the benefit in monetary terms or, at the least, make a comparison between the value of the legal services in question and the benefit "on the basis of its best economic judgment." Merola v. Atlantic Richfield Company, 515 F.2d 165, 172 (3d Cir. 1975)
 
 
 [13]
 The district court imposed a ceiling of $100.00 on the hourly billing rates of all partners and other top level attorneys and of $65.00 on the hourly rates charged by associates. This was done so that the compensation per hour to other attorneys would not exceed that awarded the lead counsel. Also, the court permitted an increase in the number of hours submitted to reflect the continuing work on the case
 
 
 [14]
 We find no fault with the lodestar figure