BELL ATLANTIC CORPORATION, Derivatively by Trustees u/w of Beatrice Wilding and Martha Staub and on behalf of themselves and all others similarly situated

v.

Thomas E. BOLGER; Anton J. Campanella; Robert H. Levetown; Raymond W. Smith; Frank C. Carlucci; William G. Copeland; James H. Gilliam, Jr.; Gerald T. Halpin; Thomas H. Kean; John C. Marous, Jr.; John F. Maypole; Thomas H. O'Brien; Rozanne L. Ridgway; Shirley Young

and

Bell Atlantic Corporation,
Nominal Defendant,

Seymour Lazar, objector and class member and shareholder,
Appellant in 92–1615,

Objectors, Anne R. Klein, Robert M. Klein and Adele Schwartz,
Appellants in 92–1653.

Nos. 92–1615, 92–1653.

United States Court of Appeals,
Third Circuit.

Argued Feb. 26, 1993.

Decided Aug. 18, 1993.

Robert C. Heim (argued), Mary A. McLaughlin, Dechert, Price & Rhoads, Philadelphia, PA, for appellees Thomas E. Bolger, Anton J. Campanella, Robert H. Levetown, Raymond W. Smith, Frank C. Carlucci, William G. Copeland, James H. Gilliam, Jr., Gerald T. Halpin, Thomas H. Kean, John C. Marous, Jr., John F. Maypole, Thomas H. O'Brien, Rozanne L. Ridgway, Shirley Young and Bell Atlantic Corp.

Sheldon L. Albert (argued), Anthony J. Bolognese, Barrack, Rodos & Bacine, Philadelphia, PA, for appellant Seymour Lazar, appellant in 92–1615.

Eric A. Klein, (argued), New York City, for appellants Anne R. Klein, Robert M.

Klein and Adele Schwartz, appellants in 92–1653.

C. Oliver Burt, III, (argued), Greenfield & Chimicles, Haverford, PA, Phyllis K. Sager, Law Offices of Phyllis K. Sager, Bryn Mawr, PA, for appellee Bell Atlantic Corp., derivatively by trustees u/w of Beatrice Wilding and Martha Staub and on behalf of themselves and all others similarly situated.

Before: MANSMANN, SCIRICA and FEINBERG*, Circuit Judges.

## OPINION OF THE COURT

SCIRICA, Circuit Judge.

This appeal concerns certain Bell Atlantic Corp. shareholders' objections to the district court's approval of a derivative lawsuit settlement. Appellant-objectors Seymour Lazar, Anne Klein, and Robert Klein[1] contend the settlement agreement between defendants and derivative plaintiff Bell Atlantic confers no benefit on Bell Atlantic and benefits only individual defendant directors and plaintiffs' counsel. The objectors' principal claim is that the district court abused its discretion by approving an unfair and inadequate settlement. We believe the settlement was fair both substantively and procedurally. We will affirm.

### I.

Subject matter jurisdiction was founded on section 22 of the Securities Act of 1933, 15 U.S.C. § 77v (1988), section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa (1988), 28 U.S.C. § 1331 (1988), and principles of pendent jurisdiction, 28 U.S.C. § 1367 (Supp.1991). We have jurisdiction over the district court's approval of the settlement agreement. *Binker v. Commonwealth of Pa.*, 977 F.2d 738, 744 (3d Cir.1992).

We review the district court's approval of a shareholder's derivative lawsuit for abuse of discretion. *Shlensky v. Dorsey*, 574 F.2d 131, 147 (3d Cir.1978); *Ace Heating & Plumbing Co. v. Crane Co.*, 453 F.2d 30, 34 (3d Cir. 1971) (where district judge approves class

---

* The Honorable Wilfred Feinberg, United States Circuit Judge for the Second Judicial Circuit, sitting by designation.

1. Hereinafter, unless otherwise noted, appellants collectively will be referred to as "Lazar."

action settlement "[g]reat weight is accorded his views because he is exposed to the litigants, and their strategies, positions, and proofs. He is aware of the expense and possible legal bars to success, ... he is on the firing line and can evaluate the action accordingly.").

## II.

### A. *Bell of Pennsylvania Matter*

This lawsuit stems from the April 1990 settlement of consumer fraud claims brought by the Pennsylvania Attorney General and the Pennsylvania Office of the Consumer Advocate against one of Bell Atlantic's subsidiaries, Bell of Pennsylvania.[2] Settlement of the Bell of Pennsylvania matter required Bell Atlantic to pay over $40 million in refunds to customers, contributions to a consumer education trust, and legal costs to the Attorney General.

Two groups of shareholder attorneys responded to the announcement of the settlement. The first group, representing shareholder Lazar, brought a derivative action in state court against nominal defendant Bell Atlantic and certain of its officers and inside directors, charging defendants with mismanagement and breach of fiduciary duty. The Lazar suit sought to recover, on behalf of nominal defendant Bell Atlantic, amounts lost due to the alleged misconduct of Bell Atlantic directors and officers.

The second group of shareholder attorneys, representing the plaintiffs in this action, Martha Taub and the Trustees under the will of Beatrice Wilding, made a demand on Bell Atlantic's board to seek recovery from those responsible for the Bell of Pennsylvania matter. In response, Bell Atlantic's board created a special committee that investigated the allegations with independent counsel. Following the investigation, Bell Atlantic's board accepted the committee's

recommendation to reject the demand as not in the company's best interests.

### B. *Procedural History*

When Bell Atlantic rejected the Taub plaintiffs' demand, plaintiffs brought a derivative action in federal court on June 11, 1991. Counts I and II of the complaint asserted federal and state claims on behalf of a class of Bell Atlantic shareholders for failing to disclose requisite information, while count III, the derivative claim, charged the officers and directors with mismanagement and breach of fiduciary duties to Bell Atlantic. Shortly before filing their complaint, the Taub plaintiffs notified Lazar's counsel of the pending suit. Lazar never attempted to intervene.

Defendants struck first, unsuccessfully seeking dismissal of the derivative claim. At the close of discovery, defendants moved alternatively for dismissal or for summary judgment, claiming the board conducted a good faith, reasonable investigation of plaintiffs' demands and that Bell Atlantic's charter insulated the board from damages. The district court found no evidence raising a genuine issue of material fact on the board's good faith in investigating plaintiffs' demands but found the record did not permit a finding as to the reasonableness of the investigation (i.e., whether the board acted in an informed manner and with due care). The district court also found that Bell Atlantic's charter absolved directors of liability for damages resulting from negligent management.[3]

Both sides prepared for trial. With the class certified, each side submitted pretrial memoranda, trial briefs, proposed findings, and jury instructions. On the Friday preceding the Monday trial date, following extensive negotiations, the parties reached an agreement on settlement. Under the settlement agreement Bell Atlantic agreed to (and did) disclose in its 1992 proxy statement information regarding the Bell of Pennsylvania

---

**2.** This settlement resolved allegations that Bell of Pennsylvania violated state unfair practices and consumer protection laws by misleading sales practices which induced customers to purchase superfluous "inside wire" maintenance and service plans.

**3.** The charter contained a so-called "raincoat provision" limiting director liability to shareholders for monetary damages for breach of fiduciary duty as permitted by Delaware law. *See* Del.Code Ann. tit. 8, § 102(b)(7) (1991).

matter, this litigation, and the Lazar state court litigation. Bell Atlantic also agreed to establish and follow new procedures to monitor sales and marketing programs. The agreement released all claims which were or could have been alleged in the complaint, including all claims arising from the Bell of Pennsylvania consumer fraud litigation. The agreement thereby jettisoned the Lazar state court claim. It also provided for counsel fees and expenses in an amount not to exceed $450,000.

After the parties filed the proposed settlement agreement on March 25, 1992, the district court approved the notice and ordered it sent to all 1.1 million Bell Atlantic shareholders. *See* Fed.R.Civ.P. 23.1. The notice summarized the litigation's background, the proposed settlement terms, and stated the settlement hearing date.

Before the settlement hearing, twenty-five shareholders, including objector Lazar, protested aspects of the proposed settlement. Plaintiffs furnished requested documents to Lazar's counsel to explore the adequacy of the settlement. At the settlement hearing, counsel for Lazar and counsel for objectors Anne and Robert Klein argued against approval of the settlement. Shortly thereafter, the district court denied all objections, approved the settlement agreement, and awarded fees and expenses to plaintiffs' counsel in the amount of $421,437.19 plus interest. Lazar and the Kleins now appeal.

### III.

### STANDING

Plaintiffs contend Lazar lacks standing to appeal the district court's order because Lazar is not a named party and failed to intervene under Fed.R.Civ.P. 24. Plaintiffs concede Lazar had standing to object to the settlement in the district court but contend he does not have standing to appeal from a court order approving the settlement. In

their view, if Lazar believed his interests were inadequately protected by named plaintiffs, then he should have moved to intervene. Failure to intervene, they claim, constitutes an implicit admission that named plaintiffs adequately represented Lazar's interests. Plaintiffs contend we should adopt a "no-intervention, no-standing" rule for appeals by unnamed members of class or derivative actions who object to settlement agreements.

■ Generally, "only parties to a lawsuit, or those that properly become parties, may appeal an adverse judgment." *Marino v. Ortiz*, 484 U.S. 301, 304, 108 S.Ct. 586, 587, 98 L.Ed.2d 629 (1988) (per curiam); Fed. R.App.P. 3(c) ("The notice of appeal shall specify the party or parties taking the appeal"). But it is not settled whether an objecting member of the class or derivative litigation who is not a named party may appeal the court's approval of the compromise. According to two leading treatises, "[a] member of the class who appears in response to the court's notice, given pursuant to the Rule [23.1], and objects to the dismissal or compromise has a right to appeal from an adverse final judgment although he did not become a formal party of record." 3B James W. Moore, *Moore's Federal Practice*, ¶ 23.1.24[3] (objector's right to appeal derivative suit settlement); ¶ 23.80[5] (objector's right to appeal class action settlement) (1993); 7C Charles A. Wright, et al., *Federal Practice & Procedure*, § 1839, at 182 (1986) ("[a]n objector to the settlement may appeal the court's approval of the compromise"); *see also Webcor Elecs. v. Whiting*, 101 F.R.D. 461, 465 n. 11 (D.Del.1984) ("The law is now settled that objectors may appeal a court's decision approving a settlement").

■ Notwithstanding these certitudes, the Fifth, Eighth, and Eleventh Circuits have ruled that an unnamed class member lacks standing to appeal an order approving a settlement between the named parties of a class action suit.[4] *See Loran v. Furr's/Bishop's*

---

4. In derivative suits, unlike shareholder class actions, recoveries belong to the corporation on whose behalf the suit was brought. *In re Pittsburgh & Lake Erie R.R. Co. Sec. & Antitrust Litig.*, 543 F.2d 1058, 1068 (3d Cir.1976). The parties have not contended and we need not decide

whether different rules apply to objector appellate standing in class and derivative suits. *See* 3B James W. Moore, *Moore's Federal Practice*, ¶ 23.80[5] n. 1 (1993) ("Principles applicable to an objector's right to appeal in a shareholder's derivative suit are ... equally applicable to class

*Inc.*, 988 F.2d 554, 554 (5th Cir.1993) (appellate court lacks jurisdiction to consider appeal by class member who has not attempted to intervene as a named party); *Croyden Assocs. v. Alleco, Inc.*, 969 F.2d 675, 679 (8th Cir.1992) ("unnamed class members who object to a settlement must move to intervene, and they will be denied standing to appeal when they have not done so"), *cert. denied*, —— U.S. ——, 113 S.Ct. 1251, 122 L.Ed.2d 650 (1993); *Walker v. City of Mesquite*, 858 F.2d 1071, 1072 (5th Cir.1988) (unnamed members of certified plaintiff class lacked standing to challenge a consent decree the district court had ordered approving a settlement between the named parties); *Guthrie v. Evans*, 815 F.2d 626, 627 (11th Cir.1987) ("a class member who is not a named plaintiff[ ] does not have standing to appeal the final judgment in [a] class action").

The reasons underlying these decisions denying unnamed class members standing to appeal are that (1) the objector may move to intervene under Fed.R.Civ.P. 24(a)(2), and the denial of the motion to intervene of right is appealable;[5] (2) the objector may collaterally attack the settlement approval by filing a separate suit challenging the adequacy of the class representation; (3) if the class is certified under Rule 23(b)(3), the individual class member may opt out; and (4) if each class member can appeal individually, the litigation would become unwieldy, and the purpose of class actions would be defeated. *Croyden*, 969 F.2d at 678; *cf. Marino*, 484 U.S. at 304, 108 S.Ct. at 588 (affirming dismissal of petitioner's suit as impermissible attack by nonparties because the "better practice is for such a nonparty to seek intervention for purposes of appeal").[6]

The Ninth and Seventh Circuits follow a different approach. Without much elaboration, they have consistently allowed unnamed, non-intervening class members standing to appeal approval of settlement agreements. For example, in *Armstrong v. Board of School Directors*, 616 F.2d 305, 327–28 (7th Cir.1980), the court permitted an objecting unnamed class member to appeal from a class action judgment. *Accord Patterson v. Stovall*, 528 F.2d 108, 109 n. 1 (7th Cir.1976). The Ninth Circuit in *Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173, 1176 (9th Cir.1977), stated that unnamed class members appealing from the district court's approval of a class action settlement had legal rights affected by the settlement and thus had standing to sue. *Accord In re Cement Antitrust Litig.*, 688 F.2d 1297, 1309 (9th Cir.1982), *aff'd*, 459 U.S. 1191, 103 S.Ct. 1173, 75 L.Ed.2d 425 (1983); *Dosier v. Miami Valley Broadcasting Corp.*, 656 F.2d 1295, 1299 (9th Cir.1981) (dissatisfied class member could have challenged settlement by direct appeal). *See also Cohen v. Young*, 127 F.2d 721, 724 (6th Cir.1942) (although settlement objector did not appeal order denying motion to intervene, objector was entitled to appeal order approving settlement because "[a]ppellant appeared in court in answer to the court's notice to show cause why the settlement should not be approved").

Although our circuit's position has not been articulated, it is suggested in *Ace Heating & Plumbing Co. v. Crane Co.*, 453 F.2d 30, 32–33 (3d Cir.1971), and implicit in our prior cases. *See In re Pittsburgh & Lake Erie R.R. Co. Sec. & Antitrust Litig.*, 543 F.2d 1058, 1064–67 (3d Cir.1976) (whether district court's order approving settlement

---

actions under Rule 23''). We note that one of the rationales offered in support of an intervention requirement cannot apply to derivative actions. That is, unlike members of a class certified under Rule 23(b)(3), "shareholders normally cannot opt out of the class and pursue their own individual action." American Law Institute, *Principles of Corporate Governance: Analysis and Recommendations* § 7.02, at 635 (Proposed Final Draft, Mar. 31, 1992).

**5.** Fed.R.Civ.P. 24(a) provides in part:
Upon timely application anyone shall be permitted to intervene in an action: .... when

the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

**6.** Unlike this case, the nonparty appellants in *Marino* were not members of the class or derivative action.

was viewed as denial of pledgee's standing to object, or as rejection on the merits, pledgee had standing to object to settlement of derivative claim even though it did not intervene; settlement reversed on merits as unfair).

*Ace* involved challenges to a district court's order approving settlement of a nationwide antitrust class action. Appellees challenged appellants' standing to appeal the order approving the settlement and contended appellees ratified or waived objections to the settlement by failing to opt out of the settlement. 453 F.2d at 32. We disagreed and determined appellants had standing, stating:

> Ordinarily, aggrieved class members may appeal any final order of a district court in proceedings held pursuant to Rule 23. This general proposition holds true even though such class members have the right to exclude themselves from the class.

*Id.* We reasoned that small claimants who could not litigate their claims absent the class action mechanism could be left with "equally unpalatable alternatives—accept either nothing at all [by opting out] or a possible unfair settlement [by opting in but lacking standing to appeal]." In those circum-

stances, "we conclude[d] that appellants ha[d] standing to appeal." *Id.* at 33.

Though *Ace* did not discuss whether objecting class members should be required to intervene as a condition for appellate standing, rejection of such a requirement was essential to its reasoning and result. Concerns with collective action problems in large-scale, small-claim class actions animated our analysis of standing in *Ace.* Collective action problems concern us here too, though for somewhat different reasons. Frequently, in class or derivative litigation the number of clients is large and the individual injuries small (though, of course, when aggregated they can be and often are quite large). Courts[7] and commentators[8] have long recognized the "agency costs" inherent in class and derivative actions where the client, as principal, is neither well-situated nor adequately motivated to closely monitor and control the attorney, his agent. Shareholders with well-diversified portfolios or small holdings lack the incentive and information to police settlements—the costs of policing typically outweigh any *pro rata* benefits to the shareholder.[9]

7. *See Greenfield v. Villager Indus., Inc.,* 483 F.2d 824, 832 n. 8 (3d Cir.1973) ("Experience teaches that it is counsel for the class representative and not the named parties, who direct and manage these actions. Every experienced federal judge knows that any statement[ ] to the contrary is sheer sophistry."); *Saylor v. Lindsley,* 456 F.2d 896, 900 (2d Cir.1972) (Friendly, J.) ("There can be no blinking at the fact that the interests of the plaintiff in a stockholder's derivative suit and of his attorney are by no means congruent.").

8. *See* Ralph K. Winter, *Paying Lawyers, Empowering Prosecutors, and Protecting Managers: Raising the Cost of Capital in America,* 42 Duke L.J. 945, 948 (1993) (in derivative actions, "plaintiffs are generally figureheads"); Jonathan R. Macey & Geoffrey P. Miller, *The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform,* 58 U.Chi.L.Rev. 1, 3 (1991) (plaintiffs' class and derivative action attorneys "subject to only minimal monitoring by their ostensible 'clients' who are either dispersed and disorganized (in the case of class litigation) or under the control of hostile forces (in the case of derivative litigation)."); Geoffrey P. Miller, *Some Agency Problems in Settlement,* 16 J.Legal Stud. 189, 190 (1987) ("the interests of plaintiff and attorney are never perfectly aligned"); John C. Coffee Jr., *Understanding The Plaintiff's Attorney: The Implications of Economic Theory for Private En-*

*forcement of Law Through Class and Derivative Actions,* 86 Col.L.Rev. 669, 677–78 (1986) (in derivative and class actions client "generally has only a nominal stake in the outcome of litigation" and cannot closely monitor and control plaintiff's attorney's conduct); Daniel R. Fischel & Michael Bradley, *The Role of Liability Rules and the Derivative Suit in Corporate Law: A Theoretical and Empirical Analysis,* 71 Corn.L.Rev. 261, 271 & n. 26 (1986) ("real party in interest is the attorney"); Deborah L. Rhode, *Class Conflicts in Class Actions,* 34 Stan.L.Rev. 1183, 1203 (1982) ("as a practical matter, once a class is certified, named plaintiffs generally are neither highly motivated nor well situated to monitor the congruence between counsel's conduct and class preferences"); *see generally,* Janet C. Alexander, *Do the Merits Matter? A Study of Settlements in Securities Class Actions,* 43 Stan.L.Rev. 497 (1991).

9. Monitoring is fraught with "free-rider" problems. Generally, the costs of monitoring will exceed the *pro rata* benefit to any single shareholder even though they may be lower than the benefits to all. Even a shareholder disposed to monitoring will have difficulty doing so—most shareholders do not learn about the litigation until receipt of the settlement notice. Finally, the named plaintiff lacks an adequate incentive to monitor for the collective action reasons men-

One of the risks flowing from shareholders' difficulty in monitoring derivative litigation is that plaintiffs' counsel and the defendants will structure a settlement such that the plaintiffs' attorneys' fees are disproportionate to any relief obtained for the corporation. Plaintiffs' attorneys and the defendants may settle in a manner adverse to the interests of the plaintiffs by exchanging a low settlement for high fees.[10] Such a risk cautions against creating obstacles to challenging derivative action settlement agreements.

Informational constraints exacerbate collective action and agency problems. The effort to obtain court approval entails the suspension, if not termination, of hostilities. In assessing settlements of representative actions, judges no longer have the full benefit of the adversarial process. *Cf. In re Oracle Sec. Litig.*, 131 F.R.D. 688, 789 (N.D.Cal. 1990) (citing *In re Activision Sec. Litig.*, 723 F.Supp. 1373, 1374 (N.D.Cal.1989)) (discussing failure of adversary system in context of plaintiffs' attorneys' fee application). In seeking court approval of their settlement proposal, plaintiffs' attorneys' and defendants' interests coalesce and mutual interest may result in mutual indulgence. The parties can be expected to spotlight the proposal's strengths and slight its defects. *See* Macey & Miller, *supra* note 9, at 46. In such circumstances, objectors play an important role by giving courts access to information on the settlement's merits. *See Stepak v. Tracinda Corp.*, No. 8457, 1989 WL 100884, at *1 1989 Del.Ch.Lexis 95, at *3–*4 (Del.Ch., Aug. 18, 1989) (objectors' "ardent[ ] resistance to the settlement" persuaded court "to look more closely at the proposal than would normally be the case"; court concluded there was "no reasonable likelihood that the pro-

posed settlement would be approved as fair and reasonable").

Given the agency, collective action, and information problems inherent in settlements of derivative litigation, and the broad view of objector standing embodied in *Ace*, we conclude Lazar had standing to appeal the district court order approving the settlement. Assuring fair and adequate settlements outweighs concerns that non-intervening objectors will render the representative litigation "unwieldy." It is sufficient that Lazar attended the settlement hearing and voiced before the district court the same objections he now raises before us on appeal.

## IV.

## FAIRNESS AND ADEQUACY OF SETTLEMENT

On June 26, 1992, the district court held a hearing, considered Lazar's (and the Kleins') objections to the settlement, examined submissions, and approved the settlement as "fair, adequate, reasonable and proper and in the best interests of the class and the shareholders." The district court found the settlement furnished a real benefit to Bell Atlantic because it required the parent corporation to institute internal mechanisms to prevent improper sales and marketing methods.

Lazar contends the settlement violates legal standards necessary for approval. Lazar claims Bell Atlantic (equated with its shareholders) received nothing while defendant directors received immunity for past conduct without paying anything, and plaintiffs' counsel garnered a large fee award payable by Bell Atlantic, i.e., the shareholders supposedly benefitting from this derivative action. Lazar contends the nonmonetary relief se-

tioned and because he is typically the attorney's chosen standard bearer.

**10.** *See* Richard A. Posner, *Economic Analysis of Law* § 21.9, at 570 (4th ed. 1992) (plaintiffs' attorney "will be tempted to offer to settle with defendant for a small judgment and a large legal fee, and such an offer will be attractive to the defendant provided the sum of the two figures is less than the defendant's net expected loss from going to trial"); Roberta Romano, *The Shareholder Suit: Litigation without Foundation?*, 7 J.L. & Econ. & Organ. 55, 57 (1991) (combina-

tion of differential indemnification rights, insurance policy exclusions, plaintiffs' counsel's interest in fees, and individual defendants' risk aversion creates powerful and potentially perverse incentives to settle); John C. Coffee, Jr., *supra* note 8, at 677 (class actions "are uniquely vulnerable to collusive settlements that benefit plaintiff's attorneys rather than their clients"); John C. Coffee, Jr., *The Unfaithful Champion: The Plaintiff as Monitor in Shareholder Litigation*, 48 Law & Contemp.Probs. 5, 9, 24, 81 (1985).

cured by the Taub plaintiffs is illusory, with Bell Atlantic merely promising to review any sales or marketing program designed by an outside consultant and assure its legality before implementation. According to Lazar, such a program already exists as a result of the Bell of Pennsylvania consumer fraud settlement. These allegations require us to assess the substantive and procedural fairness of the settlement.

## A. Substantive Fairness of Settlement

In evaluating a district court's determination that a settlement agreement is fair and reasonable, we consider factors applied initially to class action settlement agreements, *Girsh v. Jepson*, 521 F.2d 153, 156–57 (3d Cir.1975), and subsequently to derivative actions, *Shlensky v. Dorsey*, 574 F.2d 131, 147–49 (3d Cir.1978); *In re Pittsburgh & Lake Erie R.R. Co. Sec. & Antitrust Litig.*, 543 F.2d 1058, 1070 (3d Cir.1976).

> The principal factor ... is the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest.... The adequacy of the recovery must be considered in the light of the best possible recovery, of the risks of establishing liability and proving damages in the event the case is not settled, and of the cost of prolonging the litigation.

*Shlensky*, 574 F.2d at 147. We also consider the response of other shareholders to the lawsuit. *Id.* at 148.

### 1. Benefit to Bell Atlantic

■ In assessing the fairness of the agreement, that is, in comparing Bell Atlantic's costs and benefits, we face a problem of incommensurability. To begin with, it is difficult to measure the value of the benefit (structural relief). The settlement agreement mandates structural changes in Bell Atlantic's corporate governance:

> The Individual Defendants will cause Bell Atlantic to establish and implement a procedure whereby any sales or marketing program designed or recommended by outside consultants for use by the Company, Bell Atlantic Network Services, Inc., or any of Bell Atlantic's wholly owned subsid-

iaries will be reviewed prior to implementation by a Bell Atlantic Senior Manager with responsibility for marketing, in consultation with the Legal Department of the Company or the relevant subsidiary, to ensure that the program complies with all applicable laws and regulations. This procedure will also provide for the monitoring of any such program after implementation to ensure continuing compliance.

These changes constitute the directors' (and nominal defendant Bell Atlantic's) consideration for plaintiffs' (and derivative plaintiff Bell Atlantic's) agreement to halt the lawsuit and release all claims against defendants. We must determine whether these changes constitute a net benefit to Bell Atlantic. *See In re Pittsburgh*, 543 F.2d at 1068–70 (vacating order approving settlement; "for a minimal if not non-existent benefit to PL & E, the settlement costs [PL & E] $2,100,000. The actual benefits flow only to plaintiffs' attorneys and the 7% minority stockholders.").

■ Despite the difficulties they pose to measurement, nonpecuniary benefits to the corporation may support a settlement. *See Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1207 (6th Cir.1992) (corporation received release from potential liability to settling plaintiff shareholder and settlement called for changes in corporate governance aimed at limiting corporation's disbursements to settling defendant director and controlling shareholder); *Zimmerman v. Bell*, 800 F.2d 386, 391 (4th Cir.1986) (nonmonetary derivative settlement relief adequate when it provided guidelines for "future management responses to tender offers and takeover bids"); *Maher v. Zapata Corp.*, 714 F.2d 436, 466 (5th Cir.1983) (nonmonetary relief adequate settlement relief); *cf. Mills v. Electric Auto–Lite Co.*, 396 U.S. 375, 391–92, 90 S.Ct. 616, 625, 24 L.Ed.2d 593 (1970) (nonmonetary recovery on merits does not preclude award of fees). But the difficulty in valuing therapeutic relief poses significant risks. Parties may capitalize on the valuation problem and exchange cosmetic "reforms" for plaintiffs' fees, concealing a collu-

sive settlement.[11]

Lazar contends a collusive settlement occurred here. He maintains the nonpecuniary benefits are illusory because they duplicate pre-existing procedures enacted as part of the Bell of Pennsylvania settlement.[12] Our examination of the settlement agreement dispels this claim. The Bell of Pennsylvania settlement with the Pennsylvania Attorney General was signed by and affected only the Bell of Pennsylvania subsidiary. The settlement before us, however, is considerably broader and more inclusive, requiring prophylactic action by parent Bell Atlantic and all its subsidiaries. Lazar asserts the structural relief merely amounts to a promise to obey the law. This mischaracterizes the agreement which answers the question how, not whether, the parent corporation will obey the law and provides specific mechanisms to ensure employees of Bell Atlantic and all its subsidiaries behave appropriately.

Still, Lazar contends derivative plaintiff Bell Atlantic received little in exchange for surrendering its claims against the defendants. As discussed more fully below, a less sinister explanation—one specifically found by the district court—is that the probability of success on the merits was uncertain.

### 2. *Probability of Recovery on Merits*

Plaintiffs faced difficulty establishing liability on the merits (i.e. proving defendant directors breached fiduciary duties by failing to prevent the sales practices giving rise to the Bell of Pennsylvania matter and settlement). The district court, in an earlier ruling, held the charter's so-called "raincoat" provision shielded individual defendant directors from any liability resulting from their negligent acts taken as directors. *See* Del. Code Ann. tit. 8 § 102(b)(7) (1991) (allowing shareholders to amend the charter to exoner-

ate directors from monetary liability to corporation or shareholders for breach of fiduciary duty of care not involving intentional misconduct, improper payments of dividends, improper stock purchase or redemptions, or breach of duty of loyalty). So plaintiffs not only would have had to overcome the usual business judgment hurdle, the "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action was in the best interest of the company," *Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984), but also would had to have shown reckless and possibly intentional misconduct by the directors.

Lazar responds that the raincoat provision only insulates directors for actions taken after the certificate of incorporation has been amended to include the raincoat provision. Lazar notes the charter's umbrella does not cover four individual defendants in their capacity as officers and does not cover activities in the Bell of Pennsylvania matter occurring prior to amendment of Bell Atlantic's charter.

By its terms, § 102(b)(7) only applies to directors. *See* § 102(b)(7) ("[a] provision eliminating or limiting the personal liability of a director to the corporation"). It is also true the raincoat provision does not cover activities in the Bell of Pennsylvania matter occurring prior to amendment of Bell Atlantic's charter. *Id.; see also* Deborah A. De-Mott, *Shareholder Derivative Actions,* § 1:06, at 10 (Supp.1992) ("Under the Delaware statute, a director's liability arising from an act or omission occurring prior to the effective date of the corporation's adoption of [t]he provision reducing or eliminating directors' liability cannot be affected by the provision").

---

**11.** *See Coffee, The Unfaithful Champion, supra* note 10, at 25 ("Normally, in litigation, the winning side's recovery equals the losing side's losses, much as in poker. But in this variety of non-zero sum game, an absent third party, the corporation, bears the expenses of both sides. Meanwhile, the litigation is dismissed with prejudice, and principles of collateral estoppel prevent the underlying claim from being relitigated by a more faithful champion.").

**12.** We recognize the risk posed by actions with similar claims in different fora (here one in state court the other in federal court). This phenomenon risks a race to settlement in which the low bidder obtains fees and the losing bidder is collaterally estopped in its case.

Yet Lazar does not indicate how the actions not covered by the raincoat provisions could give rise to liability. He fails to tell us how these individual defendants could be responsible as officers of parent Bell Atlantic for low-level [13] employee conduct at Bell of Pennsylvania—one of six Bell Atlantic subsidiaries—which has its own separate board and officers. Nor does Lazar demonstrate the directors' liability for actions prior to the charter amendment adopting the raincoat provision. He observes the charter was amended in 1987. The Bell of Pennsylvania settlement grants refunds to customers on Bell of Pennsylvania's records from January 1, 1987 to March 31, 1988. With these dates, it is possible that some or most of the alleged malfeasance at Bell of Pennsylvania resulting in refunds occurred after Bell Atlantic adopted its charter provision limiting director liability. But even if we disregard the charter provision, it should be clear that plaintiffs faced an uphill battle. The derivative action sought to hold parent Bell Atlantic directors responsible for conduct of low-level personnel of Bell of Pennsylvania, which had its own separate board, none of whom sat on Bell Atlantic's board. Further, after plaintiffs made their initial demand on Bell Atlantic's board, a special committee armed with independent counsel undertook an investigation and determined Bell Atlantic management had acted reasonably and in the best interests of the company and had not engaged in improper behavior. This meant it would be difficult for plaintiffs to show recklessness or intentional misfeasance by the Bell Atlantic directors. Finally, the district court found the individual defendants acted in good faith.

Lazar complains the corporation did not get much. Now we may know why. Even if plaintiffs hoped to secure a large damage award, this would have to be drastically discounted by the improbability of their success on the merits given the individual defendants' strong defenses. Thus, even if we attach a small figure to the value of the corporate governance changes (as Lazar urges), this small value may be fair consideration for and accurately reflect the expected payout at trial net of the costs of trial. [14]

### 3. *Response of Shareholders*

Less than 30 of approximately 1.1 million shareholders objected. This is an infinitesimal number. [15] *See Stoetzner v. U.S. Steel*

---

**13.** "Low level" is the defendants' description but Lazar does not dispute this characterization. The alleged misrepresentations were made by sales representatives on "cold calls" to potential customers and on return calls to inquiries by current customers.

**14.** Given plaintiffs' uphill struggle, one might ask why defendants elected not to press on to trial which was only a weekend away. At the settlement hearing, defense counsel answered this question and summarized its strategy:

We settled because the relief proposed made sense. It fairly met the issue that had created the problem with Bell of Pennsylvania, and because an award of counsel fees ranging anywhere from zero to four hundred and fifty thousand dollars was not far outside the range of what we thought it would take to try this case to a jury for a number of weeks, to deal with post-trial motions and to deal with the appeal and that it made sense to us to settle the case under those circumstances and we also thought we had some risks.

[T]he Court had certified the class with respect to the 14A proxy claims so we were ... evaluating it from a defense point of view; not with the derivative claim, but with the proxy claims. If we had lost that claim and that claim was going to be submitted to jury, there was always

a possibility that we would have to send another mailing out to our shareholders and that would have been another considerable expense. All of that was part of our evaluation that this was sensible.

App. 752.

**15.** In assuming silence constitutes tacit consent to the agreement, we follow the analysis prescribed in *Shlensky*, 574 F.2d at 148; *see also In re GNC Shareholder Litig.*, 668 F.Supp. 450, 451 (W.D.Pa.1987). We recognize this assumption about the silent majority's preferences, as a practical matter, understates potential objectors since many shareholders have small holdings or diversified portfolios, *see* Richard A. Brealey & Stewart C. Myers, *Principles of Corporate Finance* 155–61 (4th ed. 1991) (discussing portfolio diversification), and thus have an insufficient incentive to contest an unpalatable settlement agreement because the cost of contesting exceeds the objector's *pro rata* benefit. That inferences drawn from response rates are only an approximation may be seen by the low response rates of class members to settlement notices notifying them they are entitled to money and need merely fill out a short form to obtain it. *See, e.g., Zimmer Paper Prods., Inc. v. Berger & Montague*, 758 F.2d 86, 92–93 (3d Cir.), (only 12% of class filed

*Corp.*, 897 F.2d 115, 118–19 (3d Cir.1990) ("only" 29 objections in 281 member class "strongly favors settlement"). This small proportion of objectors does not favor derailing settlement.

#### 4. *Stage of Litigation*

The district judge found the costs of prolonging the litigation favored settlement. Settlement occurred on the eve of trial, after discovery. This cuts both ways. On the one hand, settlement late in the day means only the costs of trial and appeal are saved. On the other hand, completed discovery means the parties are more likely to form an accurate, and thus more convergent, estimate of the likely outcome of the case and potential damages. Thus, post-discovery settlements are more likely to reflect the true value of the claim and be fair. The stage of litigation factor does not favor overturning the settlement agreement.

In sum, it is difficult to assess the substantive fairness of nonmonetary settlement relief. The risk is that nonmonetary relief may be used to mask an unfair settlement that benefits individual defendants and plaintiffs' counsel but not the corporation. Lazar insists the settlement relief was small. Even if this were so, we believe it would only reflect the underlying weakness of plaintiffs' claims in light of the business judgment rule, the raincoat provision, the fact nominal defendant Bell Atlantic's subsidiary Bell of Pennsylvania has its own separate board and managers, and the fact the alleged Bell of Pennsylvania misconduct was by low-level employees. The paucity of protestors likewise militates in favor of the settlement. We do not believe the district court abused its discretion by concluding that the settlement was substantively fair.[16]

### B. *Procedural Fairness*

According to Lazar, the district court approved the settlement without an adequate evidentiary record. Lazar claims the district court denied him an adequate opportunity to develop an evidentiary record establishing the settlement's unfairness. Lazar believes he was entitled to broader discovery, not merely to what plaintiffs already discovered. In his view, the district court should have compelled defendants to respond to his interrogatories seeking information on all costs incurred by Bell Atlantic in the Bell of Pennsylvania matter and the "benefits" obtained in settling it. The district judge found Lazar had an opportunity for access to all discovery materials in the action and an adequate time before the settlement hearing to examine them. The court also determined that discovery documents not furnished on privilege grounds were inconsequential.

Our analysis in *Girsh* illustrates the circumstances where we have held an objector was deprived of a reasonable opportunity to object. There, settlement was reached early in the litigation, before extensive discovery, and long before final preparation for trial. 521 F.2d at 155. The objector's "attempt to compel answers to her interrogatories [was] thwarted by the order of the district court, [and] her opportunity to participate effectively in the settlement hearing, through cross-examination and argument, was also frustrated by the late filing of the affidavits upon which plaintiffs and defendants relied to demonstrate the fairness of the settlement." *Id.* at 157. The objector did not "receive the affidavits submitted in support of the settlement until the day before the settlement hearing" and the district court refused to adjourn the hearing. *Id.* We had no trouble finding the combined actions of the district

claims to share in settlement proceeds), *cert. denied*, 474 U.S. 902, 106 S.Ct. 228, 88 L.Ed.2d 227 (1985).

**16.** Of course, our rules of civil procedure and evidence encourage settlement. *See* Fed.R.Civ.P. 16(c) (pretrial conference) & advisory committee's note (1983) ("Since it obviously eases crowded court dockets and results in savings to the litigants and the judicial system, settlement should be facilitated at as early a stage of the litigation as possible."); Fed.R.Civ.P. 68 (offers of judgment); Fed.R.Civ.P. 26(b)(2) (discovery of insurance coverage) & advisory committee's note (1970) (discovery contributes to settlement in some cases); Fed.R.Evid. 408 (inadmissibility of compromise offers), & advisory committee's note ("public policy favor[s] compromise and settlement of disputes"). But as our discussion shows, there is some tension between the policy favoring settlement and the realities of derivative action settlements.

court and the settling parties deprived the objector of "meaningful participation in that hearing." *Id.* at 158. The settlement hearing in *Girsh* presented the objector with a *fait accompli.*

Unlike most objectors in class or derivative actions such as the objector in *Girsh,* who remain unaware of the underlying litigation and proposed settlement until receipt of the Fed.R.Civ.P. 23.1 notice, Lazar was in a good position to develop an evidentiary record on the adequacy of the settlement. Lazar knew of the litigation before it even began; plaintiffs' counsel gave Lazar's counsel a copy of the complaint before filing it in June 1991.

Notwithstanding his early notice of the litigation, Lazar complains he "was not required to be content with the same boxes of largely irrelevant and woefully inadequate document production that the plaintiffs below were satisfied with before settling this case, as he was *challenging* the adequacy of the work done by the settling plaintiffs." However, Lazar instituted his own parallel state court shareholder's derivative proceeding in April 1990, two years before the June 6, 1992 settlement hearing in the federal court derivative action. Lazar complains Bell Atlantic pursued a dilatory strategy in state court. But even if defendants pursued a strategy of delay, it is hard to imagine that two years was an insufficient period to develop adequate facts regarding the Bell of Pennsylvania matter and its probable settlement value. Furthermore, Lazar had more than just his own discovery to go on; he had all the fruits of plaintiffs' discovery.

As the Seventh Circuit has noted, "[t]he temptation to convert a settlement hearing into a full trial on the merits must be resisted." *Mars Steel Corp. v. Continental Ill. Nat'l Bank & Trust Co.,* 834 F.2d 677, 684 (7th Cir.1987). Here, Lazar had two years to investigate the substance of the Bell of Pennsylvania matter and determine its true cost to Bell Atlantic. Lazar also had notice of the federal court suit before it was even filed. He had the complete discovery obtained by plaintiffs, his own discovery, and an opportunity to present arguments to the district judge. He even had an opportunity to intervene. In these circumstances, we believe Lazar had a fair opportunity to develop a factual record.

## V.

## REPRESENTATION OF INDIVIDUAL DEFENDANTS

Lazar impugns the settlement agreement as resulting from conflicts of interest. He attacks Dechert, Price & Rhoads's joint representation of Bell Atlantic (nominal defendant but real party in interest) and the individual defendants. The district court found no disqualifying conflict, relying on *Otis & Co. v. Pennsylvania R. Co.,* 57 F.Supp. 680, 684 (E.D.Pa.1944), *aff'd per curiam,* 155 F.2d 522 (3d Cir.1946), and *Hornsby v. Lohmeyer,* 364 Pa. 271, 279, 72 A.2d 294, 299 (1950). Both cases rejected plaintiffs' challenges to counsels' dual representation of corporate and individual defendants.

More recent cases perceive problems with this form of dual representation. For example, *Messing v. FDI, Inc.,* 439 F.Supp. 776 (D.N.J.1977), involved a derivative action charging certain inside directors in a merger with fraud which resulted in their being overcompensated for stock they owned in the acquired corporation. The outside directors were charged with negligence in connection with this merger. The same counsel initially represented the corporation, two of the outside directors, and all of the inside directors. *Messing* observed some courts have allowed directors in the corporation to be represented by the same counsel in cases that do not involve "any allegations of breach of confidence or trust" or fraud. 439 F.Supp. at 781. Yet *Messing* nonetheless found that irrespective of the allegation against the director, be it fraud or negligence, the interests of the two will always be diverse. *Id.* at 782. *Messing* required the corporation to retain independent counsel other than the attorney who represented the individual defendants.

Other courts have required independent counsel where directors are alleged to have defrauded the corporation. *See Cannon v. U.S. Acoustics Co.,* 398 F.Supp. 209 (N.D.Ill. 1975), *aff'd in relevant part per curiam,* 532 F.2d 1118, 1119 (7th Cir.1976) (district court disqualified counsel from simultaneously rep-

resenting the corporation and the individual directors accused of fraud; conflict of interests among defendants and risk that confidences obtained from one client would be used against another); *Lewis v. Shaffer Stores Co.*, 218 F.Supp. 238 (S.D.N.Y.1963) (corporation could not share counsel with individual directors accused of defrauding the corporation).

Thus, as a general matter, the case law is not uniform on the issue of joint representation of the corporation and individual defendants. Commentators are more certain. In a representative observation, one commentator says,

> There is some conflict as to the propriety of an attorney or law firm simultaneously representing a corporation and its officers and directors in a stockholders' derivative action. But the modern view is that it is generally improper due to conflict of interests for counsel to attempt to represent the corporation, on whose behalf the action has been instituted, while also representing the individuals charged with harming the corporation for their wrongful conduct.

13 William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 6025, at 442 (perm. ed. rev. vol. 1991); *see also* Harry G. Henn & John R. Alexander, *Laws of Corporations* § 370, at 1082 (1983). But these commentators recognize that "even under the modern rule, independent counsel may not be required if the derivative claim is obviously or patently frivolous." Fletcher, *Fletcher Cyclopedia* § 6025, at 443.

■■■ The ethical standards imposed upon attorneys in federal court are a matter of federal law. *County of Suffolk v. Long Island Lighting Co.*, 710 F.Supp. 1407, 1413 (E.D.N.Y.1989), *aff'd,* 907 F.2d 1295 (2d Cir. 1990). We look to the Model Rules of Professional Conduct to furnish the appropriate ethical standard. *Id.* at 1414. Under Rule 1.13(a), a lawyer's obligation runs to the entity. The commentary to Rule 1.13 provides:

> The question can arise whether counsel for the organization may defend [a derivative] action. The proposition that the organization is the lawyer's client does not alone resolve the issue. Most derivative actions are a normal incident of an organization's

affairs, to be defended by the organization's lawyer like any other suit. However, if the claim involves serious charges of wrongdoing by those in control of the organization, a conflict may arise between the lawyer's duty to the organization and the lawyer's relationship with the board. In those circumstances, Rule 1.7 governs who should represent the directors and the organization.

American Bar Ass'n, *Annotated Model Rules of Professional Conduct* (2d ed. 1992).

We believe serious charges of wrongdoing have not been levelled against the individual defendants. We say this because plaintiffs have alleged only mismanagement, a breach of the fiduciary *duty of care. Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del.1985) (duty of care requires directors to keep themselves informed and to act with requisite care). But we do not understand plaintiffs to have accused defendants of breaching their *duty of loyalty* which requires a director to act in good faith and in the honest belief that the action taken is in the corporation's best interests. *See Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983). There are no allegations of self-dealing, stealing, fraud, intentional misconduct, conflicts of interest, or usurpation of corporate opportunities by defendant directors. Indeed the district court found the directors acted in good faith in investigating plaintiffs' demands. As noted, Bell Atlantic's board charged a special committee along with independent counsel to investigate the shareholder plaintiffs' demands. The special committee and independent counsel found prosecution of these demands not in Bell Atlantic's interest. This suggests a relative (though not complete) convergence of individual and corporate interests in defending and settling the litigation. Although not dispositive, it is important that early in the litigation, independent counsel, after undertaking an exhaustive investigation, determined the corporation's interests were more in line with those of the defendants than plaintiffs. Of greater significance, however, is the absence of allegations of fraud, intentional misconduct, or self-dealing.

■ We have no hesitation in holding that—except in patently frivolous cases—allegations of directors' fraud, intentional misconduct, or self-dealing require separate counsel. We recognize that corporate law has traditionally distinguished between breach of the duty of care and breach of the duty of loyalty, the latter being more grave. *See* Del.Code Ann. tit. 8 § 102(b)(7) (charter amendment provision allowed to limit director liability for breaches of duty of care but "such provision shall not eliminate or limit the liability of a director: . . . [f]or any breach of the director's duty of loyalty"); William A. Klein & John C. Coffee, Jr., *Business Organization and Finance* 138–43, 152–58, 182 & n. 97 (1990) (discussing distinction between duties of care and loyalty). But drawing the line between breaches of care and loyalty may be difficult in many cases. *See* Frank H. Easterbrook & Daniel R. Fischel, *The Economic Structure of Corporate Law* 103 (1991) ("Ultimately, though, there is no sharp line between the duty of care and the duty of loyalty."). We do not believe the district court abused its discretion in allowing common counsel here. We note, however, that in cases where the line is blurred between duties of care and loyalty, the better practice is to obtain separate counsel for individual and corporate defendants.[17]

## VI.

### ADEQUACY OF NOTICE

The district court found the settlement notice sufficient and informative. It summarized the allegations in the complaint, informed class members of the settlement's terms, the availability of further information from the court, and the right of each class member to object and be heard at the settlement hearing.

Lazar claims the notice was inadequate. In his view, it failed to tell shareholders (1) the magnitude of losses suffered by Bell Atlantic, (2) that the company rather than insurers or the directors was bearing the fees associated with the lawsuit, (3) the scope of relief, (4) other facts concerning the *Lazar*

action, and (5) the Dechert law firm's conflict of interest.

■ Nonparty shareholders must be given notice of a proposed settlement of a shareholder's derivative action. *Maher v. Zapata Corp.*, 714 F.2d 436, 450 (5th Cir. 1983). Federal Rule of Civil Procedure 23.1 requires the district judge to direct the manner in which this notice should be given. To satisfy due process, the notice "must be sufficiently informative and give sufficient opportunity for response." *Kyriazi v. Western Elec. Co.*, 647 F.2d 388, 395 (3d Cir.1981).

■ The district court approved the form of the notice sent to all Bell Atlantic shareholders. The notice advised shareholders that a hearing to determine whether the proposed settlement should be approved would be held on June 26, 1992. The notice summarized the Bell of Pennsylvania matter, the procedural history, the parties' contentions, the issues involved, the reasons each party recommended settlement, and the terms of the settlement agreement. The notice advised shareholders of their right to object, the consequences of not doing so, and how to go about obtaining further information available on file with the court. Examination of the notice convinces us that it satisfies the requisites of due process.

Lazar argues the notice's failure to describe his parallel state court litigation and its relative merit rendered it inadequate. A similar argument was rejected in *Zapata*, 714 F.2d at 450. There, an objector to a settlement agreement claimed the settlement notice was defective for failing to disclose two pending derivative actions filed by the objector in other jurisdictions and that settlement would claim-bar those actions. *Id.* The court stated:

> [W]e feel that the notice was so worded as to make reasonably clear to the "minimally sophisticated layman," *Milstein v. Werner*, 57 F.R.D. 515, 516 (S.D.N.Y.1972), that approval of the settlement would bar claims beyond those asserted in the Texas action. The notice is not required to eliminate "all occasion for diligence on the part

---

**17.** *See* Edited Transcript of Proceedings of the Business Roundtable, 71 Corn.L.Rev. 367–71 (L. Ribstein ed. 1985) (debating merits of distinction).

of the stockholders".... [A]s concerns the failure to discuss [objector] Maldonado's New York and Delaware derivative actions, we think Maldonado's arguments ignore the other information made available to the shareholders regarding those actions. Since January 1976, proxy solicitation materials sent to the shareholders by Zapata's management have contained sections discussing first the Delaware action, and then, after December 1977, the New York action.

*Id.* at 452. The notice here proposed a "full and final disposition of any and all claims against defendants arising out of or related to the claims asserted" by plaintiffs. The notice's background section references Bell Atlantic's 1992 proxy statement, which described the two derivative suits and their relationship.

Under these circumstances, we do not believe the district court abused its discretion in approving this notice. In view of its content, it is clear the essential purpose "to fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them" was satisfied. *Philadelphia Housing Auth. v. American Radiator & Std. Sanitary Corp.,* 323 F.Supp. 364, 378 (E.D.Pa.1970), *aff'd,* 453 F.2d 30 (3d Cir.1971).

### VII.

We hold Lazar has standing to appeal, the notice was adequate, and Dechert's dual representation did not constitute a conflict of interest. The district court did not abuse its discretion in handling discovery and Lazar, given his parallel state claim and early notice of this action, had an adequate opportunity to develop an evidentiary record to examine the settlement. The settlement was procedurally fair.

We affirm the substantive fairness of the settlement. We say this with some caution because of the difficulty in valuing the nonpecuniary relief accorded the corporation. Although nonmonetary relief is adequate consideration for settling a derivative or class action, the risks of concealment and collusion are not insignificant. Derivative actions may settle for cosmetic changes and no tangible

relief to the corporation in exchange for large attorneys' fees. Nonetheless, we find no abuse of discretion.

### VIII.

For the foregoing reasons we will affirm the district court's judgment in its entirety.