

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-23-1998

# In Re: Prudential Insur.

Precedential or Non-Precedential:

Docket 97-5155,97-5156,97-5217,97-5312

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation
"In Re: Prudential Insur." (1998). *1998 Decisions.* Paper 170.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/170

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Volume 2 of 2

Filed July 23, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 97-5155, 97-5156, 97-5217 & 97-5312

IN RE: PRUDENTIAL INSURANCE COMPANY
AMERICA SALES PRACTICE LITIGATION AGENT ACTIONS

RICHARD P. KRELL, MDL transfer, N.D. Ohio,
DNJ Civil Action No. 95-6062

v.

PRUDENTIAL INSURANCE COMPANY OF AMERICA

       Richard P. Krell, as well as Objectors
       Elizabeth Bajek, Amanda Bajek,
       Helen Bartsch, Mark Ciconte,
       Raymond Dolce, Margaret Dolice,
       Louise Duggan, Peter Duggan,
       Charles Duncan, Mary Howe, Mary Krell,
       William Morris, Diana Racer, Thomas Racer,
       Gweneth Reidel, The Estate of Carl J. Scalzo,
       Marie Scalzo, Terry Sligar, Alice Smith,
       Jerry Smith, and William Walton,
       Appellants at Nos. 97-5155/5156/5312

IN RE: PRUDENTIAL INSURANCE COMPANY
AMERICA SALES PRACTICE LITIGATION AGENT ACTIONS

RICHARD JOHNSON,
Intervenor-Plaintiff in District Court

       Richard E. Johnson,
       Appellant at No. 97-5217

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 95-cv-04704)

Argued January 26, 1998

Before: SCIRICA, ROTH and RENDELL, Circuit Judges

(Filed July 23, 1998)

A. The Girsh Factors

Although Krell has not directly challenged the court's
analysis with respect to each of the nine Girsh factors, we
will examine each of them in turn.

1. The complexity and duration of the litigation

Citing the myriad complex legal and factual issues which
would arise at trial, the district court found the "anticipated
complexity, costs, and time necessary to try this case
greatly substantiate the fairness of the settlement."
Fairness Opinion, 962 F. Supp. at 536. The court found
that litigation would require expensive and time consuming
discovery, would necessitate the use of several expert
witnesses, and would not be completed for years.
Consequently, the court concluded this factor weighed in
favor of settlement.

We agree. Examining the sheer magnitude of the
proposed settlement class as well as the complexity of the
issues raised, we conclude the trial of this class action
would be a long, arduous process requiring great
expenditures of time and money on behalf of both the
parties and the court. The prospect of such a massive
undertaking clearly counsels in favor of settlement. 61

2. The reaction of the class to the settlement

This factor attempts to gauge whether members of the
_____

61. We also note that no parties have objected to this portion of the
district court's analysis.

class support the settlement. Although the response rate in a 23(b)(3) class action is relevant to the fairness determination, see, e.g., Bell Atlantic, 2 F.3d at 1313 n.15 (3d Cir, 1993); Shlensky v. Dorsey, 574 F.2d 131, 148 (3d Cir. 1978), "a combination of observations about the practical realities of class actions has led a number of courts to be considerably more cautious about inferring support from a small number of objectors to a sophisticated settlement." G.M. Trucks, 55 F.3d at 812 (citation omitted).

The district court found that, of the 8 million policyholders to whom Prudential sent the class notice, approximately 19,000 policyholders or 0.2 per cent of the class opted out.[62] The court also noted that approximately 300 policyholders filed objections to the settlement. The court found the small percentage of opt outs and objectors was "truly insignificant," and noted that the "most vociferous objectors to the Proposed Settlement are a handful of litigants represented by counsel in cases that compete with or overlap the claims asserted in the Second Amended Complaint." Fairness Opinion, 962 F. Supp. at 537. Consequently, the court concluded the limited number of objections filed also weighed in favor of approving the settlement. Id. at 537–38.

We see no abuse of discretion. While we do not read too much into the low rate of response, we believe the district court properly analyzed this factor.[63]

_____

62. The court found that approximately 700 of those who opted out wrote "to indicate they do not feel they were misled in the purchase of their insurance, are satisfied with their policies, and do not want to participate in the action against Prudential." Fairness Opinion, 962 F. Supp. at 537 n.61.

63. Krell argues that the low response rate was the result of inadequate notice. We disagree. As discussed infra S V.C.2, we believe the class notice adequately apprised the class members of their right to enter an appearance, file objections, or opt out of the proposed class, and provided a detailed explanation of the procedures for doing so.

        3. The stage of the proceedings and amount of
        discovery completed

The parties must have an "adequate appreciation of the
merits of the case before negotiating." G.M. Trucks, 55 F.3d
at 813. To ensure that a proposed settlement is the product
of informed negotiations, there should be an inquiry into
the type and amount of discovery the parties have
undertaken. Krell contends that class counsel's discovery
was insufficient to support the proposed settlement,
claiming that Lead Counsel's pre-settlement discovery
consisted only of 70 boxes of documents received in August
1996 pursuant to informal letter requests, and a number of
meetings with Prudential's chairman, Arthur Ryan. Krell
questions how Lead Counsel could have been in "second
stage settlement negotiations" before receiving Prudential's
production of over 1 million documents, videotapes, audio
tapes and computer tapes in mid-August. Finally, Krell
contends there was no vigorous, adversarial discovery
because "virtually all of Prudential's discovery obligations"
were stayed between October 1995 and September 10,
1996, and the parties didn't agree on a free exchange of
information until August 20, 1996, only a few weeks before
the proposed settlement was announced.

The district court found that "counsel for plaintiffs and
Prudential did not commence serious settlement
discussions until 18 months of vigorous litigation had
transpired," noting the parties had filed and argued a
multitude of motions, including consolidation motions,
jurisdictional motions, motions to stay competing class
actions, case management motions, and Prudential's
motion to dismiss under F.R.C.P. 12(b)(6). Fairness
Opinion, 962 F. Supp. at 538 n.62. In addition to its in-
court efforts, the district court concluded that class
counsel's pursuit of discovery also supported the
settlement. The court found class counsel reviewed a
multitude of documents provided by Prudential,64
conducted its own interviews with hundreds of current and
_____

64. This discovery included over 1 million documents, 160 computer
diskettes, 500 audio and video tapes. Fairness Opinion, 962 F. Supp. at
541.

former Prudential employees, took twenty depositions, and had access to all of the materials collected by the Task Force. Id. at 541. The district court also found class counsel took sufficient time to review the discovery materials it collected, noting that class counsel refused to discuss settlement on two separate occasions because it believed it needed further discovery. Id. (citing Weiss Aff. PP 49, 101-02.) Finally, the court found class counsels' "use of informal discovery was especially appropriate in this case because the Court stayed plaintiffs' right to formal discovery for many months, and because informal discovery could provide the information that plaintiffs needed." Id. at 542. Based on the foregoing, the district court concluded "the volume and substance of Class Counsel's knowledge of this case are unquestionably adequate to support this settlement." Id. at 541. We see no error here.

### 4. The risks of establishing liability and damages

The fourth and fifth Girsh factors survey the possible risks of litigation in order to balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement. Examining plaintiffs' ability to establish liability and damages at trial, the court concluded "the risks of establishing liability weigh in favor of approving the settlement." Id. at 540.

We believe the district court properly examined the risks faced by the putative class. The court found plaintiffs would face a difficult burden at trial demonstrating, inter alia, (1) class members were deceived by Prudential's written disclosures and illustrations; (2) their contract claims were not barred by the parol evidence rule because they conflict with the unambiguous language in the insurance contracts; (3) the necessary reliance to support their federal securities claims; and (4) their federal securities claims were not barred by the one year statute of limitations and the three year statute of repose. Id. at 539. As further evidence of the barriers facing plaintiffs, the district court took notice of a similar life insurance sales practice case in Alabama state court in which the judge overturned a substantial jury verdict against Prudential. Id. (citing Key v. Prudential Ins.

69

Co. of America, Civ. No. 93–479 (Al. Cir. Ct. Dec. 28, 1995)).
We believe the district court offered substantial reasons for
its findings.

### a. Replacement Claims

Krell argues the district court failed to consider
separately the likelihood of success at trial for those class
members who alleged "replacement claims," contending
those claims require a lesser degree of proof and may be
established by an objective review of the documents in
Prudential's files. Both Prudential and Lead Counsel
contend that "replacement policyholders faced similar
burdens to those of other Class Members in establishing
liability and damages against Prudential."[65] Prudential Brief
at 35.

The district court did not believe that "replacement
claims" are easier to prove and therefore required separate
consideration. Fairness Opinion, 962 F. Supp. at 522. We
agree. Krell offers no authority or analysis to support this
blanket assertion. In addition, the findings of the Multi–
State Task Force undermine Krell's argument.

The primary focus of the Multi–State Task Force was the
practice known as "churning" or "twisting," which it defined
as "the sale of any policy based upon incomplete or
misleading comparisons." Task Force Report at 35.
According to the Multi–State Task Force Report, the
transactions most frequently the subject of churning or
twisting complaints were financed sales and abbreviated
payment plans. Replacement transactions are a
subcategory of financed sales in which at least 25% of an
existing policy's value is used to fund the purchase of a
new policy. Id. (citing the current NAIC Replacement Life
Insurance and Annuities Model regulation, adopted in
1984).

---

65. Prudential also notes that Ohio state courts have found that a
violation of state replacement laws does not give rise to a private cause
of action. Prudential Brief at 36 (citing Springfield Impregnators, Inc.
v.
Ohio State Life Ins. Co., No. C.A. 3090, 1994 WL 95219 at *9 (Ohio Ct.
App. Mar. 23, 1994); Strack v. Westfield Cos., 515 N.E.2d 1005, 1007–8
(Ohio Ct. App. 1986)).

The Task Force Report makes clear that "none of these types of sales, financed, replacement or abbreviated pay, is in violation of the replacement regulation if properly done." Id. at 36 (emphasis omitted). It also notes that, during the late 1970s and early 1980's, the previous industry-wide disinclination for replacement sales began to give way. In 1978, for example, the National Association of Insurance Commissioners modified its model replacement regulations to reflect the growing acceptance of replacement sales, provided those sales were accompanied by necessary information and disclosure to allow consumers to "make an informed choice."66 Id. at 39-40.

Turning to its examination of Prudential, the Task Force acknowledged its goal was "to determine whether during the sale of new policies, those involving financing or replacement, consumers were adequately advised of the potential failings of the new policies or the funding basis on which they were sold." Id. at 45. The Report notes that although all of the required disclosure forms may have been completed and filed by Prudential, "[o]ne must look beyond the required forms to determine whether or not presentations were accurate and not misleading." Id. In its discussion of the remediation protocol, the Task Force explained "the documentation received from Prudential did not always support the consumer's assertion," and consequently "[w]hat was or was not agreed upon at the time of sale became a question of fact." Id. at 189; see also id. at 191 (noting that while "some replacements may have been appropriate . . . misrepresentation is never appropriate," and thus "the challenge is to distinguish appropriate replacement activity.")

Consequently, it appears that misrepresentation, rather than compliance with bookkeeping requirements, was the primary concern of the Task Force examination of

_____

66. The Task Force also noted that, in 1985, the Federal Trade Commission acknowledged that many older insurance policies were "candidates for replacement." Task Force Report at 42-3 (quoting Michael P. Lynch and Robert J. Mackay, Life Insurance Products and Consumer Information, Staff Report, Bureau of Economics, Federal Trade Commission, Washington, D.C. (November 1985)).

Prudential's replacement sales. As the Task Force Report states, it is incorrect "to assume that in any and every case where a replacement was not identified or the regulatory requirements were not met, the policyholder did not understand the transaction or that it was not properly explained." Id. at 17. We also find it significant that the state insurance regulators who crafted the initial Task Force Report did not incorporate a lesser burden of proof or otherwise distinguish "replacement claims" from other types of claims.67 Consequently, we believe the district court properly considered the role of replacement claims when analyzing the fourth and fifth Girsh factors.68

> 5. The risks of maintaining the class action t hrough trial

Under Rule 23, a district court may decertify or modify a class at any time during the litigation if it proves to be unmanageable. In re School Asbestos Litigation, 789 F.2d at 1011 (3d Cir. 1986); G.M. Trucks, 55 F.3d at 815. In this instance, the district court concluded that although"this case is manageable as a class action and [ ] the class action device is the most appropriate means to adjudicate this controversy, as the case evolves, maintaining the class

_____

67. We note that even if the different claims alleged by plaintiffs require
proof of different elements to establish liability, those differences are adequately addressed during the ADR process. ADR claims will be examined using a set of criteria specific to the type of claim filed. For example, the evidentiary considerations for a churning claim include misstatements by a Prudential agent concerning the applicable interest rate on a policy loan, the policyholder's annual income, and the use of blank, signed disbursement forms. Prudential Alternative Dispute Resolution Guidelines, Stipulation of Settlement, Ex. B, at 17. Considerations for a vanishing premium claim include whether the policyholder was advised to disregard notices from Prudential, whether the policyholder made a "significant financial decision" in reliance on the
belief that premium payments would cease, and whether the policyholder received altered or unclear sales materials from an agent. Id. at 26–27.

68. The district court also noted that "[n]one of the four states that objected to the Proposed Settlement have ever prohibited financed insurance sales and three of the four did not regulate in any respect financed insurance sales for great portions of the Class Period." Fairness Opinion, 962 F. Supp. at 549 n.77.

action may become unworkable" and require decertification. Fairness Opinion, 962 F. Supp. at 540. The court also noted Prudential had sought to preserve its objections to class certification, and would likely contest certification if the case proceeded to trial. Consequently, the court concluded that there was a risk the case might eventually be decertified, all of which weighed in favor of settlement.

Although we agree with the district court's analysis and find there was some risk of decertification which supports settlement, we pause to comment on the application of this factor in "settlement-only" class actions following the Supreme Court's decision in Amchem. Because the district court always possesses the authority to decertify or modify a class that proves unmanageable, examination of this factor in the standard class action would appear to be perfunctory. There will always be a "risk" or possibility of decertification, and consequently the court can always claim this factor weighs in favor of settlement. The test becomes even more "toothless" after Amchem. The Supreme Court in Amchem held a district court could take settlement into consideration when deciding whether to certify a class, and that, "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial." 117 S. Ct. at 2248. It would seem, therefore, that after Amchem the manageability inquiry in settlement-only class actions may not be significant.

> 6. The ability of the defendants to withstand a gr eater judgment

The district court found "Prudential's ability to withstand a greater judgment is a matter of concern."69 Fairness Opinion, 962 F. Supp. at 540. Noting that the settlement

_____

69. Prudential argued that consideration of this factor was unnecessary because of the uncapped nature of the relief. The district court rejected this claim, noting that while the compensatory relief was uncapped, the "punitive damages" component of the settlement- the Additional Remediation Amount – was limited, and thus the district court was obligated to examine this factor.

73

was valued between $1 billion and $2 billion, the court found a larger judgment could negatively impact Prudential's declining credit rating.[70] Id. The court also expressed concern that, because Prudential is a mutual insurer, non-class member policyholders could conceivably be adversely affected by an excessive settlement in the form of lower dividends. Id.

Krell claims the district court erred by finding that Prudential could not withstand a greater judgment because "neither Lead Counsel nor Prudential submitted any reliable evidence of the true value of the ADR relief." Krell Brief at 50. Krell speculates that even the $410 million minimum is inaccurate because it does not account for "profits, if any" generated by Basic Claim Relief.

We see no error here. As the district court noted, the value of the proposed settlement is difficult to determine because both the compensatory relief available under the ADR and the additional relief available through Basic Claim Relief are uncapped. The parties' experts offered valuations between $1 and $2 billion, with an absolute minimum of $410 million. While these numbers are imprecise, they are a sufficient basis for the district court to decide whether Prudential could withstand a greater judgment. In addition, Prudential's credit rating during the course of the litigation may be an appropriate indicator, among others, for the court's consideration, and its decline would support the court's analysis.

> 7. The range of reasonableness of the settlement f und
> in light of the best possible recovery and all the
> attendant risks of litigation

The last two Girsh factors ask whether the settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial. In order to assess the reasonableness of a proposed settlement seeking monetary relief, "the present value of the damages plaintiffs would likely recover if successful, appropriately

---

70. The court found that Prudential's credit rating had already declined during the course of the litigation. Fairness Opinion, 962 F. Supp. at 540.

74

discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement." G.M. Trucks, 55 F.3d at 806 (quoting Manual for Complex Litigation 2d S 30.44, at 252). On appeal, Krell argues the district court declined to address this issue, instead finding the analysis unnecessary because all injured policyholders would receive full compensatory relief.

Krell has mischaracterized the district court's opinion. The district court applied the final two Girsh factors, although it did not attempt to reduce its analysis to a concrete formula. The district court found that calculating the best possible recovery for the class in the aggregate would be "exceedingly speculative," and in this instance such a calculation was unnecessary because the reasonableness of the settlement could be fairly judged. The court instead examined the nature of the settlement and the range of possible outcomes for those participating in either the ADR process or Basic Claim Relief, and concluded that "an individual's recovery exceeds the value of the best possible recovery discounted by the risks of litigation." Fairness Opinion, 962 F. Supp. at 540.

For example, the court found class members who have clear claims against Prudential will receive scores of "3" and will "receive a choice between full rescissionary or compensatory relief plus interest." Thus they will receive full compensation without paying attorneys fees and without undue delay.71 The court concluded this relief "is not only fair, it is exceptional." Id. at 540-41. Those class members who received a score of "2" – where the evidence on balance supports the claim – would receive 50% of their damages without having to pay litigation costs or fees, an award the court concluded was equivalent to what the claimant would have received at trial. Id. at 541 ("The 50%

_____

71. In response, Krell contends that the court's belief that full compensatory relief is available relies on the flawed "assumption that 100% of the wrongfully replaced policyholders will understand the notice and form the requisite `belief ' and  complete the 16 page proof of claim form and thereafter prevail in ADR." Krell Brief at 45. But Krell ignores the fact that any claim, whether brought at trial or under the ADR process, will require evidence of deceptive conduct in order to support liability.

award plus 100% interest is equivalent to a full award minus litigation costs, attorneys' fees, and the price of delay."). The court also found the settlement was fair for those receiving a score of "1" in the ADR process and for those electing Basic Claim Relief – those who would not have had a claim or not elected to bring one – because the Basic Claim Relief recovery is greater than what they would have gotten at trial.72 Id.

We believe the district court adequately addressed these factors and agree its examination "accounts appropriately for the nuances of this Proposed Settlement." Id. at 535 n.58. As the court noted, both the structure of the settlement and the uncapped nature of the relief provided make it difficult to determine accurately the actual value of the settlement. Consequently, the traditional calculus suggested by the Manual for Complex Litigation 2d and adopted by this Court in G.M. Trucks cannot be applied to this case. But we cannot find the district court abused its discretion when it found that the remedies available under the proposed settlement provided extraordinary relief. When balanced against the best possible recovery and the risks of taking this case to trial, these remedies weighed in favor of the proposed settlement.

It is worth noting that since Girsh was decided in 1975, there has been a sea-change in the nature of class actions, especially with respect to mass torts. In this regard, it may be useful to expand the traditional Girsh factors to include, when appropriate, these factors among others: the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement

_____

72. The district court also took notice of the procedural safeguards contained in the ADR process, including the four tier review process designed to ensure an accurate and fair scoring of class members' claims. See discussion supra S I.B.1.

for individual class or subclass members and the results achieved – or likely to be achieved – for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.73 Of these factors, the only one relevant

_____

73. See Edward H. Cooper, Mass Torts Model, prepared for the Conference On Mass Torts, Mass Torts Working Group, Philadelphia, PA (May 1998).

Other related factors that also may be relevant to this inquiry are discussed by Judge William Schwarzer in his article, Settlement of Mass Tort Class Actions: Order Out of Chaos, 80 Cornell L. Rev. 837, 843–44 (May 1995). The factors suggested by Judge Schwarzer include:

>	(1) Whether the prerequisites set forth in subdivisions (a) and (b) [of
>	Rule 23] have been met;
>
>	(2) Whether the class definition is appropriate and fair, taking into
>	account among other things whether it is consistent with the
>	purpose for which the class is certified, whether it may be
>	overinclusive or underinclusive, and whether division into
>	subclasses may be necessary or advisable;
>
>	(3) Whether persons with similar claims will receive similar
>	treatment, taking into account any differences in treatment between
>	present and future claimants;
>
>	(4) Whether notice to members of the class is adequate, taking into
>	account the ability of persons to understand the notice and its
>	significance to them;